## THE ISLE OF MULL.

### (District Court, D. Maryland.  March 26, 1919.)

1. SHIPPING ⊜⇒51—CHARTERS—BREACH—REQUISITION BY ADMIRALTY.

On a libel by the American charterer of a British vessel, which had been requisitioned by a firm of Admiralty agents, *held*, that the requisition must be treated as an act of the Admiralty.

2. SHIPPING ⊜⇒51—CHARTERS—REQUISITION BY ADMIRALTY.

Where the British Admiralty in a Spanish port requisitioned a British vessel under charter to an American firm, *held*, that the British owner was not required to resist the requisition for the benefit of the charterer, and the requisition must be treated as a restraint of princes, regardless of whether the right to requisition vessel in foreign waters existed, for as soon as the vessel put to sea it could have been taken in charge by the first British man-of-war.

3. SHIPPING ⊜⇒51—CHARTERS—REQUISITION OF VESSEL BY ADMIRALTY.

In determining the effect of the requisition of a chartered vessel by the British Admiralty, no distinction should be made on the question whether the charter was a voyage or time charter.

4. SHIPPING ⊜⇒51—CHARTERS—REQUISITION OF VESSEL BY ADMIRALTY.

Though the charter party of a British vessel to an American firm contained the usual clause as to restraint of princes, yet where vessel was requisitioned by the Admiralty at a rate in excess of the rate fixed by the charter party, and the Admiralty retained control of the vessel until after the expiration of the charty party, *held*, as the charterer would have made a profit despite the requisition, such requisition cannot be accepted as a frustration of the contract, and the charterer is entitled, the owner having repudiated the charter party, to the difference between the rate fixed in the charter party and the hire paid by the Admiralty.

5. SHIPPING ⊜⇒58(2)—REQUISITION OF VESSEL—ACTION—LIBEL.

A charterer of a British vessel, which was requisitioned by the Admiralty during the life of the charter, *held* not to be in any wise estopped from asserting rights based on the validity of the requisition, notwithstanding the original libel was on the theory of the owner's repudiation of the charter party.

6. SHIPPING ⊜⇒38—CHARTER—REQUISITION OF VESSEL.

Where the British Admiralty requisitioned a vessel under charter to an American corporation at a rate in excess of the rate fixed by the charter, the American corporation cannot insist that the charter party should remain in force, so that it might be entitled to the excess, and at the same time claim the right to refuse to take the ship, if the requisition was of short duration and ended at a time when market rates were below that fixed in the charter party.

7. SHIPPING ⊜⇒58(1)—CHARTER OF VESSEL—COAL—REQUISITION.

Where the British Admiralty requisitioned a British vessel under charter to an American firm, and paid the British owner for coal found in the bunkers, which belonged to the charterer, but which the owner was entitled to buy under the charter party, *held*, that the charterer was entitled to recover for the value of the coal.

8. SHIPPING ⊜⇒51—CHARTER—OWNER'S REFUSAL TO ALLOW VESSEL TO VISIT PORT OF WARRING NATION.

The owner of a British vessel, under charter containing the usual restraint of princes clause, properly declined to allow the vessel to proceed to the German port of Bremen at a time when a state of war between England and Germany existed.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. SHIPPING ⟨≈⟩51—CHARTER—BREACH—OBJECTION TO VOYAGE TO PORT OF WARRING NATION.

Where the port of Rotterdam was a safe port, *held* that, though a state of war between Germany and England existed, the owner of a British vessel under charter to an American firm was not warranted in refusing to allow the vessel to proceed to Rotterdam, and where his refusal lost the charterer a chance at the Rotterdam cargo, the charterer was entitled to deduct from the charter hire for the delay of the vessel occasioned by the unwarranted refusal.

10. SHIPPING ⟨≈⟩50—CHARTERS—INSURANCE—ALLOWANCE.

Whether or not a vessel under charter is insured against war risk was a matter solely for the owner, and though the owner obtained such insurance because the charterer desired to send the vessel to a Dutch port, though the voyage was not made such sum cannot be charged against the charterer.

11. SHIPPING ⟨≈⟩49(2)—CHARTERS—PAYMENT OF COMPENSATION—RIGHT TO DEDUCTION—WAIVER.

Where a charterer, on demand of the owner, paid amounts which it had withheld in order to save the vessel and prevent the owner from declaring the charter party at an end, *held*, that such payments did not operate as a waiver of claims to amounts which the charterer was entitled to deduct.

In Admiralty. Libel by the Gans Steamship Line against the Isles Steam Shipping Company, Limited, owner of the steamer Isle of Mull. Decree for libelant.

Haight, Sandford & Smith and Edward Sandford, all of New York City, for libelant.

Kirlin, Woolsey & Hickox, of New York City, and Ritchie, Janney & Stuart, of Baltimore, Md. (John M. Woolsey, of New York City, of counsel), for respondent.

ROSE, District Judge. The libelant is a corporation of New York; the respondent, of the United Kingdom. The former will be called the charterer; the latter, the owner.

On January 7, 1914, the owner's British steamship Isle of Mull entered upon the 5-year term of service with the charterer, contracted for by a charter made on the 19th of the preceding May. On the 11th of July, 1915, at Bilboa, Spain, upon demand of those assuming to act for the British Admiralty, the owner placed the ship at the service of that department of the British government, and so far as the record shows or suggests it remained in that service until after the chartered term expired on January 7, 1919.

The charterer, after the ship was taken over by the Admiralty, continued to tender the charter hire, which the owner refused to receive.

By its libel, the charterer charges that the owner repudiated the charter party. It said that such use of the ship as the charter promised it, from July 11, 1915, to the end of the charter term, was reasonably worth to it £5,110 a month. The charter hire was £1,370. Its loss was therefore at the monthly rate of £3,740, which, for the 41 months and 27 days of the 5 years unexpired from the 11th day of July, 1915, amounted to about £156,597 8s.

The charter contained the usual restraint of princes clause, but the charterer says that for two reasons that proviso has nothing to

do with the case: Because (1) it asserts that those who attempted to requisition the ship did not have, and could not be given, the power to act for the Admiralty in such a matter; and (2) that neither the 'Admiralty nor any other executive department of the British government had any legal authority to requisition a British ship not in a British port, or in waters adjacent thereto. Of these, in their order.

[1] In the first instance, the requisition was made by a firm of Admiralty agents. For anything which is shown to the contrary, they, and they alone, decided that this particular steamship should be requisitioned, rather than another, or none at all. If the owner had refused to pay any attention to their orders, some more formal action by the Admiralty itself would doubtless have been required before resort could have been had to any coercive measures; but in point of fact the owner, supposing that the agents were speaking for the Admiralty, did what it was told to do, and in a few days the Admiralty ratified what had been done in its name. It has ever since given orders as to the use of the ship, and has made monthly payments to the owner therefor. What was done must be held to have been an act of the Admiralty.

[2] It is admitted that there was no legislative authority to requisition British ships in foreign ports or waters, and that, assuming, in the absence of statute, it was competent for the crown to take over such ships against the consent of their owners, no order in Council or royal proclamation had empowered any one to requisition vessels so situated. The owner, however, contends that the power so to do has been a prerogative of the crown for upwards of 700 years, and while for more than two centuries immediately preceding the outbreak of the World War it had not been used, it had never been surrendered, nor had it legally become obsolete, and that it may be and was properly exercised through the Lord Commissioners for executing the office of the Lord High Admiral of the United Kingdom.

The discussion of this question, found in the record in the form of depositions by experts in the constitutional and legal history of England, not only exhibits a wealth of learning, but is extremely interesting as well. It was conducted by confessed masters of the subject. Prof. Holdsworth, the distinguished historian of the English Law, and Mr. Dunlop, for seven years standing counsel to the Commissioners of the Admiralty, were of the opinion that the prerogative existed, while Sir Henry Erle Richards, professor of International Law at Oxford, and Mr. Marus Warre Slade, a well-known specialist in such matters, were as firmly persuaded that it did not. It is doubtful if there anywhere exists anybody else as well qualified to speak on the disputed question as are these four gentlemen. It is safe to say that there are none better informed upon it, and yet they are equally divided. They have produced copies of royal writs issued as early as the first decade of the thirteenth century, when John was king, and before the barons at Runnymede had forced from him the Great Charter. They have learnedly discussed that Case of the Ship Money which for well-nigh 300 years has made Hampden famous among the champions of constitutional liberty. They have carried the

story down to the Restoration, through the days of the Common-wealth, and have told how Blake, when about to attack the Portuguese for the countenance they were giving to the disorderly sailors of Prince Rupert, took possession in the Tagus, or at its mouth, of nine British ships under charter to the Portuguese, and bound for the Brazils.

All agree that in the eighteenth and nineteenth centuries the prerogative, if it existed, was not exercised. Those who believe that it still lives explain that there had been no occasion to resort to it after merchant ships were no longer useful as units of the battle fleet, and before the days when England, depending on oversea transit for her very existence, was forced to struggle with submarine attacks upon her commerce. Their equally learned adversaries assert that the writs which are cited as evidence that the prerogative of Plantagenet, Tudor, and Stuart extended so far, were all or nearly all addressed to the Cinque Ports or other places which held property or franchises from the crown upon tenure of serving the king with ships, as the great body of the tenants in chief did upon tenure of military service, and that, upon the abolition of feudal tenures by the Restoration Parliament, these rights necessarily became obsolete. No one, it seems, questions the power of the crown to requisition a British ship in British ports, or in the waters adjacent thereto, and as early as the 3d of August, 1914, the day before England declared war, a royal proclamation announced Orders in Council authorizing the requisition of ships in such ports and waters.

The libelant's experts assert that such of the writs as were not merely calls upon the liege towns for their feudal duty were directions to seize ships in English ports, including in such ports not unnaturally those in France, which then owed allegiance to the British crown, such as to Bayonne in 1345, part of the more than princely dower which, nearly two centuries before, Eleanor of Guienne had brought to Henry of Anjou, and which for more than 100 years longer was to remain faithful in its allegiance to England's kings, or to Calais in 1452, a date midway between its conquest by Edward III and its loss by that Mary whom her contemporaries sometimes called "Bloody."

Sir Walter Scott was himself well grounded in ancient lore. In his account in the Antiquary of the dispute between Jonathan Old-buck and Sir Arthur Wardour as to the racial affinities of the Picts, he has caricatured the difficulties in the way of reaching definite conclusions upon such controversies as that which occupies so much of the present record. As a rule, we know little or nothing at all of the circumstances surrounding the issue and enforcement of any of the ancient documents produced. Their significance usually depends upon what those facts were, and each of the disputants supposes that, if they were known, they would harmonize with the view to which he adheres. When the learned so differ, any conclusion of the unlettered would be without worth.

In the case at bar, the Admiralty did not in the most literal sense take the ship out of the hands of the owner. What it did was to re-

257 F.—51

quire the owner to operate its property as the Admiralty directed. The owner was left with many duties. It has been decided that the Admiralty had no power to compel the owner of a ship to do anything other than to surrender his ship. China Mutual Navigation Co. v. Maclay, 34 T. L. R., 81. Such other decisions as have been given are, on the whole, not very favorable to the theory that, independent of statute, the power of the crown to requisition the property of its subjects extends far.

There is, however, no question that the Admiralty did commandeer many British ships in like situation with the Isle of Mull, and almost always without challenge. It could not have seized the ship while in a Spanish port, but, as the evidence shows, it would have taken possession of her so soon as she passed out of Spanish territorial waters. Great Britain was then engaged in the mightiest struggle of all time. Never had she been in such deadly peril before, unless perhaps when the armies of Napoleon were concentrated in the camp at Boulogne. Under these conditions, what did the British owner owe the charterer? It had no right to induce the Admiralty to take the ship. Chicago & Eastern Illinois R. R. Co. v. Collins Produce Co., 249 U. S. 186, 39 Sup. Ct. 189, 63 L. Ed. ——. There is no suggestion in the evidence that it did. Was it required to go further, and refuse to obey the orders of its government? It would not have seemed to it that such a course would have profited the charterer, for the first British man-of-war which would have encountered the Isle of Mull would have taken possession of her. To have assumed an attitude, which to the overwhelming majority of Englishmen would have seemed highly unpatriotic, might well have cost the owner much. The law does not impose such an obligation upon it. Its freedom to leave the ship in the charterer's service was in fact effectively restrained by the action of its government, however much lawyers may now or then dispute as to whether such restraint was of right.

This conclusion eliminates the charterer's demand that the owner shall put it, from a pecuniary standpoint, where it would have been, had the Admiralty never acted. It would not be proper to say that, at the hearing before me, the libelant abandoned this contention, but it did not seem to me that it was very earnestly pressed.

[3, 4] There is another aspect of the case which requires more consideration. The Admiralty's action, so far from costing the owner anything, profited it greatly. The government paid it £2,361 15s. a month; that is, £991 15s. in excess of the charter hire, or £41,525 14s. 6d. for the period between the taking over of the ship and the expiration of the chartered term. Doubtless the gain actually realized by the owner was somewhat less, because in the Admiralty's service the ship, while in dry dock or otherwise undergoing repairs, was off hire, as it was under similar circumstances when in the charterer's employ.

The Admiralty assumed the payment of all war risk insurance, a very large item. In other respects, its requirements appear to have been substantially the same as those imposed by the original charter party. It is true that it did not furnish coal for the galley and electric lighting, but that was of small moment. It is therefore certain

that, to an amount not much less than the sum above named, the owner has benefited by the Admiralty's action, while the loss to the charterer, if not as great as the £156,597 8s. claimed, was still unquestionably much larger than the profit the owner made.

At the hearing the libelant strongly insisted that it was entitled to recover the equivalent, at the least, of the sum by which the amount received by the owner exceeded the charter hire. The owner says that such a claim is for an accounting for money had and received, and is not within the jurisdiction of the Admiralty. This reply misinterprets the nature of the charterer's contention, which is that the owner wrongfully refused to recognize its continuing rights under the charter. If so, to determine the amount of the injury thereby done, it may be necessary to do some figuring, and to set off some items against others; but the like is incidental to most cases in which damages are sought, whether they be for maritime or nonmaritime causes of action.

The substantial defense of the owner is that the action of the Admiralty extinguished the charter and all rights under it. Many of the cases dealing with the effect of Admiralty requisitions upon charters were heard before the charter period had run out, and while the ship was still in the public service. F. A. Tamplin S. S. Co. v. Anglo Mexican Petroleum Products Co., Limited, T. L. R. [1916] 2 App. Cas. 397. No one then knew whether the government would release the ship before the time at which, in normal course, the charter would expire. Some of the confusion in judicial utterance is doubtless due to this uncertainty. This is, perhaps, the reason why it was for some time doubtful whether there was not a different rule for time and for voyage charters. Lord Parker of Waddington, in the Tamplin Case, supra. It is apparently now settled that no distinction is to be made on that ground. Lord Sumner and Lord Shaw of Dunfermline, in Bank Line, Ltd., v. Arthur Capel & Co., House of Lords, 35 T. L. R. 150.

That does not mean that every act of government which would release both parties from further performance of a charter for a voyage, or for a brief term, would put an end to one which had months or years yet to run. If a ship were chartered for a single day, for example, that of some fixed holiday, like the Fourth of July, or for a day upon which a yacht race or a naval review was to take place, and the government requisitioned the ship for that 24 hours, there could be no question that the purpose for which the contract was made had been completely frustrated. It is not likely that any one would contend that the government's taking possession of the ship for so brief a period would put an end to a charter for 5 years. They are governed by the same rule in this, however: That in one case, as in the other, the question is whether, after the government has acted, the contract is still capable of execution in such a way that the purpose of neither party in making it has become in a substantial sense impossible. If it is, the contract still lives, although some adjustment of rights under it may be required.

Earl Loreburn, in the Tamplin Case, supra, said:

"Some delay or some change is·very common in all human affairs, and it cannot be supposed that any bargain has been made on the tacit condition that such a thing will not happen in any degree"

—a remark peculiarly apt when dealing with long-time charters.

In the instant case we are not called upon to speculate what will happen. We know what has happened. We have no concern with one at least of. the factors in the complicated calculation directed by Mr. Justice Rowlatt in Chinese Engineering & Mining Company, Ltd., v. Sale & Company [1917] 1 K. B. 599, 33 T. L. R. 464. Upon the assumption that the charter existed until January 7, 1919, we know precisely how far the purpose of each of the parties at the time the contract was entered into was effected by the action of the Admiralty. The owner would receive all the charter hire for which it bargained. It would, have to pay for coals for galley and lighting, and it is possible that the Admiralty required it to supply some appliances which the charter did not. These, however, were trivial matters, and were doubtless compensated for many, many times over by the Admiralty's assumption of the cost of war risk insurance. The Admiralty might have sent the ship anywhere, and might therefore have ordered her to some of the seas in which the charterer could not have used her. It does not appear, however, that anything of the kind was done. The charterer had a right to subcharter. The owner, if the contract be held in force, would be left in every substantial business sense in the same situation it would have been in, had the ship passed into the Admiralty's service by a subcharter from the charterer.

The terms of the charter party indicate that the charterer hired the ship to make money by using it in the carrying trade generally, either on its own account or by subchartering it to others. No more definite purpose can be gathered from the charter party itself, or from any of the evidence in the case. If the charterer's contention now under consideration be sustained, it will have achieved its purpose. Its profits since the Admiralty took over the ship will be nearly $200,000 of our money. It is true that this sum·is less than one-third of what it would have cleared, had the admiralty kept its hands off; but, on the other hand, it is highly probable that it is much more than, at the time the charterer executed the charter, it so much as hoped to realize.

If the charter be held to have continued to exist, each party will get what it sought by the charter to secure. There has been no actual frustration, either of their mutual purpose or of the purpose of either of them.

The owner answers that from what the Admiralty did the law conclusively presumes a constructive frustration, independently of how it affected the interests of the parties. It is said, when people enter into a contract which is dependent for the possibility of its performance on the continued availability of a particular thing, and that availability comes to an end by reason of circumstances beyond the control of the parties, the contract is prima facie regarded as dissolved. Lord Justice Pickford, in Countess of Warwick S. S. Line, Ltd., v. Le Nickel Société Anonyme, 34 T. L. R. 27.

The owner says that the contract in this case was for the use of the Isle of Mull. The Admiralty took her and kept her for 3½ years and until after the charter term had expired. The owner insists that, when a requisitioned ship ceases to be available, the charter itself comes to an end. There are legal rules which must be enforced no matter how hardly they occasionally press upon individuals; but, when a court is urged to apply one of them in such a way as to work an injustice to one of the parties at its bar, it behooves it to make sure that what it is asked to do is required by the reason of the doctrine it is besought to enforce, and not merely by the words in which it has been found convenient and usually sufficiently accurate to formulate it.

Doubtless Lord Justice Pickford was speaking of a charter party, and the thing in his mind was a chartered ship. But the question remains whether, in the instant case, the requisitioning of the ship put an end, in any true sense, to her availability for the purpose of the contract. As already pointed out, it did not from a practical standpoint end her availability for the purpose the parties had in mind when they signed the charter. She was still earning money for them, and earning it in a way which in fact differed but little from that in which they had then expected. If the argument for the owner went no farther than this somewhat formal logic, there would be little difficulty with the case; but there are some other considerations to be taken into account.

The Admiralty did not take the ship for a definite time. It might have returned it at any moment, and would then have ceased to pay for it. It has been asked whether it would have been fair to have said to the charterer on the 11th of July, 1915: The Admiralty has taken the ship, and no one knows how long it will keep her. Nevertheless you are still bound by the charter, and must take the chance of finding some use for the ship whenever, if ever, during the next 3½ years it may, without notice, be thrown upon your hands. Looking backward from our present vantage ground of knowledge of what has happened, we know that in any event the charterer would have profited from the continuance of the charter.

The demand for ships began towards the end of 1914, and so long as the war lasted it grew ever more insistent. Since the first of this year, freight rates have gone down not a little; but they are even now far above those prevailing prior to August, 1914. The charterer could have found ample employment for the Isle of Mull whenever the Admiralty surrendered her. It will be argued that we should close our eyes to what we now know, and put ourselves in the position of the charterer in the summer of 1915. Submarine warfare on merchant ships had then been going on for nearly 5 months. The destruction of tonnage had already been great. No immediate end to the war or to the waste of shipping was in sight. There was a great probability that high freight rates would prevail for some years to come. During each month the requisition lasted, the Admiralty paid enough over the charter hire to have made good to the charterer all it would have lost, had the ship lain absolutely idle for more than 3

weeks. This particular charterer insisted that the charter had not been terminated. Under the conditions then existing, it is certain that almost any other person in its place would have done the same.

In the case at bar, as well as in all or nearly all of the others which have turned upon the wartime requisitioning of a ship then under an ante bellum charter, the price paid by the Admiralty was greater than the charter hire. If the charter be held still in force, the owner loses nothing, and the charterer saves something. If the opposite ruling be made, the owner profits much, and the charterer loses greatly. The first determination, rather than the second, comes in such cases nearer to doing what we instinctively feel to be justice. But how is it when the Admiralty pays less than the owner was receiving under his charter, as was usually true when the ships taken over were under charters made in 1915 or subsequently? If the charter under such circumstances is still effective, the charterer will be compelled to pay for something which he is not receiving, and the owner will lose nothing. If the Admiralty requisition extinguishes the charter obligations, the charterer's loss, if any, will be the amount by which the going rate of freight exceeds the charter hire, and the owner will lose the difference between the price the charterer is paying and the sum the Admiralty gives it.

Judge Learned Hand, in a case strikingly like that at bar, said the owner may not be deprived of his assurance of a fixed hire, when the venture turns out to be a loss, and deprived of the gain when it results in a gain. Earn Line S. S. Co. v. Sutherland S. S. Co. (D. C.) 254 Fed. 126. Yet, when the owner is hurt, the charter has nothing to do with his loss. He suffers, not because his boat was under charter, but because the Government takes his ship and pays for it, not only less than the market price, but less than the smaller sum for which he had hired it to the charterer. He would have been at least as badly off if his charter had expired the day before his ship was commandeered. Still the feeling that there is some lack of mutuality in allowing the determination of whether the charter has been frustrated to depend at all upon where the loss entailed by the act of the state falls is natural, and has unquestionably, as in the case last cited, often been decisive of the result.

The modern doctrine of frustration assumes that the parties to a contract enter into it upon the implied understanding that conditions, under which performance is in some substantial sense possible, exist and shall continue. But if the parties to a time charter had reduced that understanding to words, how would they have phrased it? It is not likely that they would have said that the party who is not hurt by what the government does shall be free to end the contract, and thereby make a great profit for himself against the protest of the other, who was the only person who suffered at all. It is true that it is not easy to give the choice of treating the contract as dead or as alive to one party under any other circumstances than those in which the other party is at fault. It is not improbable that the great difficulties which the courts would have as to the how and the when under which the choice must be made, the absurdity of making believe that

the parties had tacitly gone into such details, and the feeling that otherwise there would be some lack of mutuality, have been among the causes which have led many eminent judges to hold that what is silently understood is that, when what happens is sufficiently serious to justify one party in treating the contract as at an end if he wills, it is at an end whether he so wills or not. Earn Line S. S. Co. v. Sutherland S. S. Co., supra; Lord Loreburn, in the Tamplin Case, supra.

Such a rule is clear and simple. It can be applied with far less trouble than any other. It is true that it goes further in upsetting contracts than in some cases may be just and expedient. Its application to the instant case is still more questionable. Because the Admiralty has deprived one party to a contract of a part, but only of a part, of the profit he had a right to expect, why should the other party, who has not been hurt at all, be free to treat the contract as at an end, and thereby greatly profit? Judge Hand in Earn Line S. S. Co. v. Sutherland S. S. Co., supra, ably argued that it would be unfair to hold the charterer bound against his will, because, he says:

Had the parties, when they made the contract, "been faced with the possibility that during the term the ship would be seized at a great discount from the then going hire, obviously, if both were fair, they would have treated it as like a seizure without hire at all. The charterer's right and risk in the variation in rates would be 'loaded,' in the language of an actuary, with a heavy discount. He would not, if I may use the phrase, be getting a fair run for his money."

Quite obviously the argument is applicable to those cases only in which, at the time of the requisitioning, the charterer fears that the ship will be released before the time fixed by the charter for its expiration in regular course. Unless he anticipates that possibility, it will be to his interest to preserve the charter whenever the Admiralty rent is greater than the charter hire. That is as easily recognizable when he entered into the charter as at any other period, for it will involve no choice more difficult than that of willingness to have money which costs nothing. In this particular case, suppose, at the time the parties were making their contract, the thought had occurred to the charterer that perhaps the government would take over the ship during the time it had her under charter, and would keep her for the balance of the chartered period, paying for her in round numbers £1,000 a month more than it was binding itself to pay the owner. Under these circumstances will the charterer want the right to terminate the charter party? Obviously it would say, "No." It had incurred all the risk that the ship might not be chartered, and all the losses, up to the time the ship was requisitioned, resulting from paying the charter hire, which during that time may have been above the going rate. In the particular case, if the charter survived the requisition, the charterer in the next 3½ years would have received $200,000 without any additional risk or expense. It certainly would not want to stipulate that, in such a contingency, the charter would not be binding.

In the instant case, let us put ourselves in the position of the charterer when he entered into the charter party. Suppose it had been told

that there was a possibility, at some indefinite time during the continuance of the charter, the Admiralty would requisition the ship for £2,361 15s. a month. Would it want to stipulate in its charter that, if that happened, the charter should be at an end? If that proposition were put to it, it would say not if the requisition is to last as much as 2 years and 10 days, for if it does, and we have to keep the ship without using it at all during the remaining 17½ months of the chartered term, we will be as well off as if the charter was ended by the requisition.

It is not likely that going rates will ever be so low that the ship will not command a freight sufficient to pay for her bunker coals and other small running expenses, which the charterer must bear. In view of these obvious facts, the practical results of the doctrine laid down in some of the cases are sufficiently curious. A charterer would never stipulate that a requisition for the whole, or for nearly the whole, of the chartered term, at a higher rate than the charter hire, should end the contract.

Judge Hand (Earn Line S. S. Co. v. Sutherland S. S. Co., supra), following the Tamplin Case, supra, albeit reluctantly, held that a requisition which is likely to end when the charter had a considerable period to run did not amount to a frustration. Yet that was the only kind of a requisition under which a charterer would have wanted to be free of his bargain, and, when the Admiralty's compensation is above the charter hire, the owner is not affected at all; that is to say, those cases assume that the parties when they made the charter agreed that it shall be ended if the ship should be requisitioned under circumstances which made it certain that neither parties will lose by the bargain, and that one will have a substantial profit, and shall remain binding if, at the time of the requisition, it was quite possible that one of them will, as the result, be worse off than if he had not entered into the agreement. It would hardly seem that a rule which leads to such results can be altogether sound.

It may be that the true doctrine should be that the charter is ended by any requisition which, at the time it is made, seems likely to take the ship into the government's service for any substantial part of the chartered term, irrespective of what other effects it has or has not. The reasoning of some of the judges who have dealt with the question logically goes to that extent, but it cannot yet be said to be the settled law. 35 Law Quarterly Review, 84. Until it is, a court of first instance will hesitate to apply it where it will work injustice, in the sense, at least, that it will take $200,000 from one of the parties and give it to the other, who, except for the requisition, would have had no claim upon it.

Most men instinctively feel that nobody else should be allowed to profit by the exceptional conditions brought about by the war, however prone each individual may be to consider his own case an exception. Judges should be chary in upsetting the bargains of business men, especially when the effect will be to give an unexpected and unearned advantage to one of them at the cost of the other. Until the ripened wisdom and deliberate consideration of the appellate tribunals

shall have formulated principles to be applied, irrespective of how they affect the pecuniary fortunes of any of the parties, it may be well for the trial courts to content themselves with the more modest rôle of determining each case, so as to preserve, as far as may be, the contract interests of the suitors at its bar, whenever that may be done without entailing hardships on any of them.

After all, the class of cases to which this belongs is incidental to the Great War. The world has not seen anything like it for 100 years. Every one everywhere is praying and planning that it shall be the last great clash of arms. Nevertheless it is not unreasonable to hope that a century may pass before we have another. No great harm may come if we do fail to lay down a general rule for the determination of controversies which seldom arise, except when a cataclysmic disturbance engulfs the world.

It follows that the charterer is entitled to recover from the owner, as the damage which it suffered by the repudiation of the charter, the amount which would have been received by it, had its rights under the charter party been recognized. Apparently this will be the amount by which the Admiralty hire exceeded that fixed by the charter for the days during which the ship was in the Admiralty pay, diminished by such sums, if any, as the Admiralty's requirements would have compelled the charterer to expend, and which, under the charter party, it would not have been called upon to lay out.

[5] I have not lost sight of the contention of the owner that it is now too late for the charterer to claim anything upon the assumption that the ship was validly requisitioned. It is true that the libel is altogether silent as to the Admiralty's action. It was filed on July 24, 1915, only 13 days after the ship was taken into the government service. At that early date, and on this side of the Atlantic, it would scarcely have been possible for the charterer to allege more than what has since been proved to be true, namely, that the owner had repudiated all its rights under the charter party. As a mere matter of pleading, it was not bound to anticipate the owner's defense in whole or in part, or to set up any facts which might limit the quantum of damages to which it might be entitled. There is, of course, no question that as late as 3 years and more after the ship was requisitioned—that is, when the depositions were taken in November, 1918—it still contended that the owner should have ignored the requisition. It supported its opinion by the testimony of some of the most learned authorities in the United Kingdom. In the result, however, it has been held that it was wrong, and that the damages to which it was entitled are less than half they would have been, had it been right. There is in all this nothing of an estoppel, for it is not pretended that anything the charterer said or did led the owner to do aught that it would not otherwise have done.

In the fervor of argument, the learned advocate for the owner said something about being surprised. If the charterer had originally made the claim it now does, I do not quite see what additional testimony the owner could have taken, other than that which will be admissible upon the assessment of damages. If, however, it thinks it has on the

main issue any which it wishes to put in, an application made within the next 10 days to reopen the proofs for that purpose will be given due consideration.

[6] I do not recall that at the hearing it was contended that the charterer had framed its libel so it might have a chance to refuse to take the ship if the Admiralty requisition was of short duration, and ended at a time when the market rates for ships were below that fixed by the charter. In considering the case in its various phases, the possibility that such a claim might be made has been taken into account. If there was, as there is not, anything in the record anywhere to suggest that the charterer intended to keep open such a way of retreat, it certainly should not be allowed to recover upon the only theory upon which it seems it may recover at all. The review already made of conditions existing in July, 1915, shows how improbable it is that then, or at any subsequent time, it had any such purpose.

[7] In addition to damages for repudiation of the charter, the libel makes two other claims against the owner. As already stated, the charterer, while the ship was in its service, supplied the bunker coals. To save the unnecessary trouble and expense of taking some coals out and putting others in, the charter contained the usual provision that the charterer would pay the owner for the coals in the bunkers at the time the ship entered upon its chartered employment, and would sell to the owner those on board when the charter ended.

When the Admiralty took the ship, 506 tons of the charterer's coal were in the bunkers. The Admiralty paid the owner for them. Nevertheless the latter has now the assurance to contend that it owes the charterer nothing for them. For the owner it is said that the obligation to pay for the coals was found in the charter, and when, as it claims, that was frustrated by the requisition, all rights under it ceased. The only trouble with this reasoning is that the coals never belonged to the owner. The Admiralty's requisition was not intended to give the charterer's chattels to the owner. The doctrine of frustration, whatever bearing it has upon the charter, has nothing to do with these coals. Indeed, as was said at the hearing, to give the owner title to them would require a frustration, not only of the charter party, but of the eighth commandment as well.

[8] The remaining question in the case does not concern itself with the Admiralty requisition. It turns on incidents which happened many months earlier. On the 3d of September, 1914, the ship was in Charleston harbor. The charterer notified the owner that it wanted to send the ship to Rotterdam and Bremen, and suggested that, if the owner preferred not to send it to either of these ports, the charterer would consent to a cancellation of the charter. It is needless to say that freight conditions were then very different from what they became a few months later. The offer of cancellation was declined. The owner pointed out that by the terms of the charter the ship could not be required to go to Bremen, and objected to going to Rotterdam on the ground that that was an unsafe port. For some days the charterer continued to press its demand that Bremen was one of the ports to

which the ship had a right to go. Meanwhile the time for the monthly payment in advance came around, and it was not made. The owner stopped discharge of cargo; then the charterer paid the monthly hire and withdrew the demand to go to Bremen. The discharge of cargo was thereupon resumed, but when, on the 18th of September, the charterer called on the owner to make arrangements to get ready to go to Rotterdam, it was again met with a refusal.

On the 26th of September the owner agreed that the ship might go to Rotterdam, but by that time the charterer had lost the chance of the Rotterdam cargo, and had to take another for Marseilles. When the next monthly payment came to be made, the charterer deducted a sum equal to the charter hire for an aggregate of 12 days and 16 hours, being 4 days and 15 hours during which the discharge of cargo was stopped, and 8 days and 1 hour after cargo was discharged, during which the use of the ship was lost to the charterer, as is alleged, by the wrongful refusal of the owner to have the ship go to Rotterdam.

Quite clearly the charterer had no right to ask that the ship be sent to Bremen, for war had been declared between England and Germany a month earlier. It had no right to withhold payment of the charter hire because of the refusal of the owner to comply with the unjustifiable demand, and that much of the charterer's claim may be dismissed from consideration.

[9] On the other hand, Rotterdam was a neutral port, and, from the evidence, I do not believe it was an unsafe port. The record and common knowledge convinces me it was no more dangerous to go to Rotterdam in September or October, 1914, than it was to go to Newcastle after the German proclamation of submarine blockade, and Newcastle has been held to be, at that time, a safe port within the meaning of those terms as used in a similar charter party. Palace Shipping Co., Ltd., v. Gans S. S. Line, [1916] 1 K. B. 138. I confess, in view of the fact that the ship did not go to Rotterdam, and the obvious desire of the charterer at that time to cancel the charter, that I doubt whether it ever wanted to go to Rotterdam; but that is only a suspicion, and the evidence is that it did. Under such circumstances, the charterer is entitled to an allowance for 8 days and 1 hour that the ship was out of service from the 18th of September until the 26th.

[10] The owner claims that it should in any event be credited against this with the net amount it paid to get war risk insurance to Rotterdam. I should be glad to sustain this claim, but I do not see my way clear to do so. Whether the ship was insured or not was a matter entirely for the owner. The charterer had nothing to do with it.

[11] The owner says that, whatever originally may have been the rights of the parties with reference to these delays in September, 1914, the charterer has waived all right to recover anything for them. From the October payment of monthly hire, the charterer deducted a proportion for 12 days and 16 hours it claimed to have been deprived of the services of the ship. The owner protested, but it was not until the next spring, when freight rates had gone up rapidly, that it took the position that it would cancel the charter if these deductions were

not repaid. The charterer, under protest, paid them. It is now said that such payment cannot be recovered. It was made either in accord or satisfaction, or under a mistake of law. I do not think it should be so treated. In charter parties of this kind it is highly expedient that the law shall not be such as to force either of the parties to take extreme measures for the protection of comparatively minor, but still substantial rights.

The learned advocate for the owner, in the argument at the hearing, contended with great force that, whether the owner was justified or not in refusing to go to Rotterdam or Bremen, the charterer was still bound to pay the charter hire when and as it became due. Under such circumstances its payment would not be a waiver of the right of the charterer to recover for the damage done it. I agree with the construction put upon the clause by the owner's advocate, and I therefore think that, when the owner insisted on having the charter hire fully paid, the charterer would have been unwise to refuse to make payment. I see no reason to lay down rules of law which will compel parties to aggravate their disputes. Had, in the spring of 1915, the charterer refused to repay the money it had withheld, the owner would doubtless have withdrawn the ship from the charterer's service, and then the dispute between the parties would have amounted to many thousands or hundreds of thousands of dollars, instead of being confined to less than $3,000. The charterer is therefore entitled to recover damages for the wrongful delay at Charleston of 8 days and 1 hour.

In view of the large volume of deposition testimony and of the fact that almost all of it relates to the power of the Admiralty to requisition a ship, upon which issue the owner won, I shall order the costs to be equally divided between the parties. If they cannot agree as to the amount of the damages to which the libelant is entitled under the principles herein stated, I will either hear them further as to such amount or will make an order of reference to ascertain them.