## FARMERS' FERTILIZER CO. v. LILLIE.

(Circuit Court of Appeals, Sixth Circuit. April 6, 1927.)

No. 4580.

1. **Principal and agent** ⊛=47—**Contract to sell defendant's products exclusively for five years held to obligate defendant to fill plaintiff's orders, though business became unprofitable.**

Contract, under which defendant fertilizer company engaged plaintiff as its sole state agent for five years, to sell fertilizer and other products of defendant exclusively, "to parties approved by the company and as offered in Michigan," *held* supported by sufficient consideration, and obligated defendant to continue filling plaintiff's orders during term of contract as against contention that defendant was entitled to refuse to make further shipments to that state because business therein became unprofitable; words, "and as offered in Michigan," relating only to types of goods to be offered in state.

2. **Principal and agent** ⊛=33—**Provision of exclusive selling agency contract for nonliability of manufacturer under certain conditions held to negative existence of option to terminate.**

Provision of five-year exclusive selling agency contract, that defendant fertilizer company shall not be liable for failure to manufacture and ship fertilizers to plaintiff by reason of unavoidable accidents, wars, strikes, labor troubles, or other delay, if such delay is beyond company's control; *held* to negative existence of any option in defendant to terminate contract.

3. **Contracts** ⊛=309(1)—**That conditions have increased expense of performance of contract over anticipated expense is not impossibility excusing performance.**

An abnormal rise in price of goods or transportation charges due to war or unusual trade conditions, so that defendant cannot perform contract without greater expense than anticipated, is not an impossibility excusing performance.

4. **Witnesses** ⊛=275(6)—**Refusal to permit cross-examination of plaintiff as to his income, after breach of agency contract not requiring all his time, held not error.**

In action for breach of contract under which plaintiff was engaged as sole state agent to devote the principal part of his time and put his best efforts to sell defendant's products in the state, refusal to permit cross-examination of plaintiff as to whether he had any remunerative employment after such breach, on issue of mitigation of damages, was not error, question being what income he received as result of being relieved from performance of contract.

5. **Witnesses** ⊛=275(5)—**Defendant is not entitled to cross-examine plaintiff on subject not contained in examination in chief.**

Defendant is not entitled to cross-examine plaintiff on a subject not contained in the examination in chief and as to a question on which defendant has burden of proof.

In Error to the District Court of the United States for the Eastern Division of the Southern District of Ohio; Benson W. Hough, Judge.

Action by Colon C. Lillie against the Farmers' Fertilizer Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Frank E. Wood, of Cincinnati, Ohio, for plaintiff in error.

C. E. Blanchard, of Columbus, Ohio (Morton, Irvine & Blanchard, of Columbus, Ohio, on the brief), for defendant in error.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. This writ is brought to review a judgment rendered in favor of defendant in error (plaintiff below) for breach of a contract made between the parties on or about November 15, 1915, under circumstances and in the terms hereinafter stated.

Plaintiff in error (hereinafter called the Company) was engaged in the manufacture, at Columbus, Ohio, and in the sale in Ohio and other states, of fertilizer and other articles made the subject of the contract. Lillie, plaintiff below, who resided at Coopersville, Mich., had had, immediately preceding the contract in suit, many years' experience as general agent for the sale of fertilizers in Michigan. By the first paragraph of the contract the company in terms engaged plaintiff "for a period of five years from and after November 15, 1915, as its sole agent for the state of Michigan for the sale of its fertilizer, silos, lime, and feeding tankage"—all inquiries to the company from Michigan to be referred to plaintiff.

It also agreed to furnish plaintiff, on or about November 1st of each year, with the prices at which all goods were to be sold for the ensuing twelve months, such prices to be subject to change when market or other conditions should warrant; also to furnish plaintiff with brands of fertilizers similar in analysis and price to those furnished and sold by its chief competitors, and to do everything "reasonable and possible" to enable plaintiff to meet competition, the brands of fertilizer so furnished to be licensed by the company as "Lillie's special brands." By mutual consent, "farmers" or other brands might be licensed and sold. The company further agreed to furnish stationery (except envelopes) sufficient for the necessary business correspondence and also for circular letters, to be approved by the company, to be sent to farmers advertising the goods; also to have printed two special circulars each year (spring and fall issues) in sufficient quantity to supply plaintiff's mailing list, their subject-matter to be furnished by him and approved by the company, which agreed to furnish plaintiff and his local agents a reasonable supply of the company's regular advertising matter, catalogues, booklets, etc.; also to pay plaintiff $1.50 commission on each ton of fertilizer sold at regular prices, the commission on lime, feeding tankage and silos for each year to be such as mutually agreed upon by the parties, the commissions to be paid substantially semiannually.

The trial court held lime and feeding tankage not involved in this suit. Lillie testified, without dispute, that the commission on silos was later agreed upon at 15 per cent. The company further agreed to advance plaintiff $250 per month, beginning November 15, 1915, to be deducted substantially at six-months intervals from commissions earned. Plaintiff agreed "to devote the principal part of his time, and put his best personal efforts on the sale of the company's fertilizer and other products in Michigan; and do everything possible by way of canvassing, circularizing, and advertising to encourage the sale of the company's products." Two paragraphs not so far recited will be referred to later.

During the first year of the contract, plaintiff's agents, approved by the company, sold a considerable amount of fertilizer and a number of silos, on which plaintiff's commissions aggregated $3,359.06. During the next year there were substantial delays in the company's approval of agency contracts, presumably contributing to the great reduction in sales for that year. In 1918 the company confined plaintiff's territory to the southern part of Michigan. In that year orders under contract were accepted and filled by defendant for about one-half of the amount of fertilizer sold the first year, although more than sold the second year. At the opening of the second year, the company advised plaintiff it would sell no silos that year, and refused his request for permission to sell silos of another manufacture. Until July 1, 1918, the monthly advances of $250 were made; refusal to continue the advances was made July 15, 1918; and no payment was thereafter made. The company refused to ship any fertilizers into Michigan during the years 1919 and 1920, or to approve contracts of plaintiff's local agents.

[1] Defendant bases its claimed right to reversal upon two propositions:

1. The first is that the contract did not obligate it to ship goods into Michigan to fill plaintiff's orders, unless its refusal to do so was made in bad faith; that is to say, if defendant was justified, in the exercise of good business judgment, and in the absence of bad faith toward plaintiff, in refusing shipment to and sale of its products in Michigan. This proposition was presented by appropriate motion to direct verdict for defendant, as well as by requested instruction to the jury.

We are unable to agree with this contention. The contract was not an ordinary brokerage contract, without term and without consideration. The term was definitely stated (paragraph 2) as "five years from and after November 15, 1915." We find no statement of limitation or reservation by the company as to this term, or any authority to exercise an option whether or not to terminate the contract before the end of the five-year period. Ample consideration for the company's promise is found in plaintiff's agreement (paragraph 3) to "sell exclusively the above-mentioned products to parties approved by the company and as offered in Michigan," and impliedly during the entire five-year period. Plaintiff thus agreed not to sell for any of the company's competitors for the Michigan trade, and there were several such. As already stated, defendant refused to allow plaintiff to buy silos of another manufacturer. Plaintiff's long and intimate connection with the trade in question, as well as with cognate activities hereinafter referred to, presumably gave his promise substantial value. The terms of the contract, taken together—including the provisions for furnishing prices for

the year ahead, for furnishing brands of fertilizers similar in analysis and price to those furnished and sold by the company's chief competitors, for brands licensed as "Lillie's Special Brands," for stationery, circular advertising letters, regular advertising matter, catalogues, and booklets, and the agreement to do everything reasonably possible to enable plaintiff to meet competition—repel the idea of an existing option in defendant to terminate the agreement before the end of the specified term. Cf. Great Lakes Co. v. Scranton Coal Co. (C. C. A. 7) 239 F. 603, 606, et seq.; also Hollweg v. Shafer (C. C. A. 6) 197 F. 689, 696, et seq.

[2, 3] We see no merit in the suggestion that the words, "and as offered in Michigan," qualify the company's engagement of plaintiff for a full five-year term, or gave defendant an option to ship or not to ship into Michigan, as its belief regarding its own interests might dictate. We think it clear that the words in question relate only to the *types of goods*, provided to be furnished plaintiff to be offered in Michigan. Moreover, the subsequent provision for defendant's nonliability for failure to manufacture and ship fertilizers to plaintiff or his agents "by reason of unavoidable accidents, wars, strikes, labor troubles, fire, or other delay, if such delay is beyond the company's control" (the only provision for release of defendant's liability contained in the contract), by natural implication negatives the existence of any option to terminate. An abnormal rise in the price of goods, or in transportation charges, due to the existence of war, or unusual trade conditions, such that defendant could not perform its contract without greater expense than anticipated, is not such an impossibility as will excuse performance. 8 British Ruling Cases, 538; Wickham Co. v. Minnesota Co. (C. C. A. 7) 7 F.(2) 873. Counsel cite several English cases,[1] to the general effect that there is no implied condition that the business itself shall continue to be carried on during the contract period, and thus, for example, that an agreement to furnish coal, or to employ one as agent for a steamship line, or to act as buyer in England for a firm in India, was not violated by disability to perform, caused in one case by the sale of the colliery, in another by the sale by defendant of the vessels and good will of their line, and in the remaining case by the dissolution of the firm in In-

dia. Of these cases it is enough to say that they have no application to the case before us. For comment on one or more of them, see Great Lakes Co. v. Scranton Coal Co., supra. Here defendant did not sell out or go out of business, but continued therein in Ohio during the entire term of the contract. At the most, defendant's claims seem to be that it could not profitably compete with its competitors in view of increased prices and expenses, including difficulties (but apparently not impossibility) in getting supplies and materials. Plaintiff testified, without dispute, that the use of fertilizer in Michigan doubled between 1915 and 1920.

[4] 2. Defendant's other complaint is that the court rejected evidence (by way of mitigation of damages) of plaintiff's earnings during the term released to him through defendant's refusal to proceed with the contract. The basis of the complaint is this: Near the close of his cross-examination, plaintiff, who was a witness in his own behalf, had thus testified:

"Q. When you looked around for another fertilizer company to take on your orders, and fill you orders, you were not able to find one that could do it? A. No, sir; very small chance to get anybody that didn't already have a selling organization in Michigan, and I was absolutely unprepared for it. I did not expect to get anybody.

"Q. What have you been doing, or what did you do with your time, and how did you employ it during the years 1919 and 1920; did you have any remunerative employment during those years? A. I got a living.

"Q. Can you tell me what salary, or what money you earned during the year 1919 approximately?" Plaintiff's objection to this question, and a similar one respecting the year 1920, were sustained.

On the merits of the question, we think defendant not entitled to complain. Plaintiff did not agree to devote his entire time to work under the contract. The agreement was "to devote *the principal part of his time,* and put his best efforts on the sale of the company's fertilizer and other products in Michigan, and do everything possible by way of canvassing, circularizing, and advertising to encourage the sale of the company's products." He had testified, on cross-examination, as stated in the margin.[2]

---

[1] Rhodes v. Forwood, 1 App. Cas. 256; Lazarus v. Cairn, 116 Law T. R. 378; Northey v. Trevillian, 18 Law T. R. 648.

[2] During the five years' period he "had a farm of 320 acres on which he was at that time engaged in raising blooded stock. The care and management and operation of the farm required some of his time. Witness was also connected

The pertinent question then was not whether he had any remunerative employment during 1919 and 1920, but what income he received *as the result of relief from performance of the contract in suit* during 1919 and 1920. No offer was made of what was further expected to be shown, or to follow up the question with pertinent inquiries. It is perhaps not without interest to note that at the very opening of plaintiff's redirect examination, and immediately following the exclusion of the quoted question, plaintiff testified that he "considered that he put in practically all of his time on this contract. He went to Saginaw to a board meeting once a month that was held in the evening. Those other things did not interfere a particle with my working up this fertilizer trade, and they did not amount to anything." There was no further cross-examination on that subject.

[5] Moreover, defendant is otherwise scarcely in position to complain of the exclusion of the question, for the reason that it was not entitled to cross-examine on a subject not contained in the examination in chief (Hales v. Mich. Central R. Co. [C. C. A. 6] 200 F. 533, 538; Foster v. United States [C. C. A. 6] 178 F. 165, 168, 177, 178), and, indeed, as to a question on which defendant, and not plaintiff, had the burden of proof (Campfield v. Sauer [C. C. A. 6] 189 F. 576, 580, 38 L. R. A. [N. S.] 837).

. The judgment of the District Court is affirmed.

---

with a live stock insurance company, as president. His duties as president of that corporation took a little of his time. The Peninsular Fire Insurance Company was organized and began doing business in 1919 or 1920. Witness was with it from the beginning of its organization as president. Witness devoted some of his time to the business of that company. Witness also was president of the Michigan Live Stock Breeders' Association in 1920. He was connected with it before. Witness was identified with the Michigan Mutual Creamery and Cheese Factory Fire Insurance Company since its organization in 1908; first he was president, of recent years he had been secretary and treasurer. During all of the years of the contract with the Farmers' Fertilizer Company he was connected either as president or secretary and treasurer of the organization. That organization required a little of his time. Witness had a position on a Michigan farmers' and agricultural paper for 25 or 30 years. They sent him agricultural inquiries once in a while and he answered editorials. He ran a sort of an information bureau in that paper, answering letters and giving advice. This paper is published every week. During the life of his contract, witness guessed he was president of a bank. As president of a bank that took some of his time. Directors' meetings were usually held in the evening."