## MEGAN v. UPDIKE GRAIN CORPORATION.*

### No. 11015.

Circuit Court of Appeals, Eighth Circuit.

Feb. 7, 1938.

Wymer Dressler, of Omaha, Neb. (Robert D. Neely, of Omaha, Neb., and William T. Faricy, of Chicago, Ill., on the brief), for appellant.

Alfred G. Ellick, of Omaha, Neb. (Edward J. Shoemaker and James J. Fitzgerald, Jr., both of Omaha, Neb., on the brief), for appellee.

Before GARDNER, SANBORN, and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

This is an action at law brought by Charles P. Megan, trustee of the property of the Chicago & North Western Railway Company in proceedings under section 77 of the National Bankruptcy Act, as amended, 11 U.S.C.A. § 205, appellant, against the Updike Grain Corporation of Omaha, Neb., appellee. Jurisdiction is based upon diversity of citizenship.

The appellant sought to recover $33,-963.31 due and unpaid rental, and accruing rental at the rate of $4,823.33 per month, under a written lease between appellee and the railway company. The demised property was a 2,500,000-bushel grain elevator upon the right of way of the railway company in Council Bluffs, Iowa. The petition alleged that the original written lease, a copy of which is set out, was executed November 23, 1928, and was for a term of five years beginning August 1, 1928. A second lease supplemental to and continuing the

*Rehearing denied March 8, 1938.

term of the first lease for a further period of five years was executed June 5, 1933. The rental agreed to be paid in the supplemental lease for the extended term was $56,-370.96, payable in monthly installments of $4,823.33 in advance. The appellee paid rental regularly at all times during the existence of the lease up to the first of October, 1936, since which time it has failed and refused to pay any rent.

The answer is in the nature of a plea in confession and avoidance. The execution of the lease, performance thereunder until October 1, 1936, and refusal to pay rent thereafter are admitted. It was denied that any rental accrued after that date for the reason that "the situation and state of affairs upon which the defendant's promise was grounded, in the making of said contracts, have been frustrated, the object of the contracts has failed, and said contracts have been voided and were void on and prior to and ever since October 1st, 1936." The facts, or state of affairs, constituting frustration of the contracts, or which render their performance legally impossible, are stated in substance and in brief as follows:

In 1904 Omaha and vicinity, including Council Bluffs, Iowa, became a public grain market through the incorporation of the Omaha Grain Exchange in 1903 and by the establishment on June 10, 1904, of certain railroad rates and tariffs upon grain moving into and through such market; that such favorable rates and tariffs and certain transit service, and other privileges then established encouraged the movement of grain and of grain products through the Omaha market and made the operation of grain elevators there a profitable business; and that it was during the continuance of these favorable conditions that the leases were made. It is further alleged that at the time the leases were made "it was mutually contemplated, assumed, anticipated and understood by both parties" that the favorable rates and tariffs would remain in effect during the term of the leases and indefinitely thereafter; and that such assumption was the inducing cause for appellee's, and the basic reason for both parties', entering into the contracts.

It is then alleged that the Chicago & North Western Railway Company joined with all the other railroad companies entering the Omaha market in filing rates and tariffs with the Interstate Commerce Commission effective July 1, 1935, so materially changing the rate and transit and other privileges as to divert large quantities of grain away from the Omaha market, as a result of which the elevator has become practically worthless and its rental value destroyed. In his reply the appellant denied that the contracts were entered into because of existing or anticipated rates on grain or transit privileges at Omaha, and averred that both parties knew that the rental was fixed upon the basis of a fair return upon the cost of the elevator, and that they knew that rates were subject to the Interstate Commerce Act and the lawful orders of the Interstate Commerce Commission.

At the trial appellant put the leases and the admissions in the answer in evidence and rested. The testimony of the appellee showed the rates and privileges in effect at Omaha prior to July 1, 1935, and that the changes then effected were the result of an order of the Interstate Commerce Commission. The president of the Updike Grain Corporation testified that the changed conditions had destroyed more than 50 per cent. of the business of the demised elevator, and that it was no longer possible to operate it at a profit under the lease.

Both the president of the railway and the president of the grain company testified, over objection, that when they negotiated the renewal of the lease in 1933 they did not anticipate any substantial change in the rates which had existed without any important variation since 1904.

The introduction of evidence was concluded on May 20, 1937, at which time appellant moved for a directed verdict, and his motion was overruled. Thereupon appellee moved for a directed verdict, and its motion was sustained. On June 1, 1937, the court adopted findings of fact and conclusions of law submitted by appellee, and judgment was entered against the appellant.

At the outset there is a claim that the findings of fact so made by the court are conclusive. Appellee, however, claims for them no greater effect than that they "sufficiently present the facts necessary to be known for the application of the rules of law contended for by the Updike Company, without recital of the particular testimony upon which the findings are based." We have compared the findings with the testimony and we find no "disputed question of fact which could operate to deflect or control the question of law" presented. Beut-

tell v. Magone, 157 U.S. 154, 157, 15 S.Ct. 566, 567, 39 L.Ed. 654.

Although some of the assignments of error relate to the admission of testimony, all are governed by a determination of whether the facts pleaded and proved by appellee were sufficient to establish a defense.

The theory of appellee's defense, adopted by the trial court, was and is that by reason of the change which took place in railroad rates and in transit and other privileges at the Omaha grain market on July 1, 1935, contrary to the assumption and expectation of both parties to the contracts, through no fault of the Updike Company, the leased elevator can no longer be used for the purpose and in the manner contemplated by the parties without unconscionable loss to the lessee; that hence the object of leasing the property and the basic reason inducing the contracts have been frustrated and the operation of the elevator in the manner anticipated has become impossible within the legal definition of the term.

In their brief counsel for appellee formulate the rule of law for which they contend as follows· "Generally, parties to a contract assume the chance that performance may become more difficult and expensive than it was at the time when the contract was entered into, or appeared likely to become; but where an excessive and unreasonable increase in expense is caused by a circumstance not only unanticipated, but inconsistent with the facts or condition of affairs which the parties actually or obviously assumed as likely to continue, the promisor who is harmed thereby, if without fault for the changed condition of affairs, is excused from performance."

It is settled in the courts that, "In contracts in which the performance depends upon the continued existence of a given person or thing, a condition is implied, that the impossibility of performance arising from the perishing of the person or thing shall excuse the performance." Taylor v. Caldwell, 3 Best & Smith, 826, 6 E.R.C. 603; The Tornado, 108 U.S. 342, 2 S.Ct. 746, 27 L.Ed. 747; Howell v. Coupland, (1876) 1 Q.B.D. 258. Performance is excused where compliance with the terms of the contract is made impossible by an act of state, Texas Co. v. Hogarth Shipping Co., 256 U.S. 619, 631, 41 S.Ct. 612, 65 L.Ed. 1123; Harlock v. Beal (1916) L.R. 1 App. Cas. 486; or the object in the contempla-

tion of the parties when the contract was made fails to come into existence, Krell v. Henry (1903) 2 K.B. 740, 72 L.J.K.B.N.S. 794, 89 L.T.N.S. 328, 19 Times, L.R. 711, 52 Week Rep. 246; Marks Realty Co. v. Hotel Hermitage Co., 170 App.Div. 484, 156 N.Y.S. 179; or performance is frustrated by the hazards of war, The Kronprinzessin Cecilie, 244 U.S. 12, 37 S.Ct. 490, 61 L.Ed. 960; The Isle of Mull, 257 F. 798, D.C.Md.; or when the promised performance is the delivery of specific property, or payment out of a particular source, which is subsequently destroyed, Operators' Oil Co. v. Barbre, 10 Cir., 65 F.2d 857; Lorillard v. Clyde, 142 N.Y. 456, 37 N.E. 489, 24 L.R.A. 113; Mantousek v. Galligan, 104 Neb. 731, 178 N.W. 510, 12 A.L.R. 1270.

■ The principle of frustration of contracts, or of impossibility of performance, is of ancient origin, and is applicable to a great variety of contracts. The rule deduced from the decisions in the Restatement of the Law of Contracts, § 288, is as follows: "Where the assumed possibility of a desired object or effect to be attained by either party to a contract forms the basis on which both parties enter into it, and this object or effect is or surely will be frustrated, a promisor who is without fault in causing the frustration, and who is harmed thereby, is discharged from the duty of performing his promise unless a contrary intention appears."

■ It is unnecessary to pursue the discussion of the principle further, because it is apparent the situation in the present case does not come within it, nor within any of the cases relied upon by appellee. It is like none of them. This is not a case of frustration or impossibility in the legal sense. The immediate object of the contract, the use of the elevator, has not been frustrated. The elevator has not been destroyed; it still stands. The railroads which haul grain to and from it are still in operation. The Omaha grain market still functions, and the elevator business and the handling of grain and grain products continues since July 1, 1935, as before. The frustration complained of relates to a more remote objective—the making of a profit out of the use of the leased premises. There is nothing in the lease indicating an agreement or understanding either that the rent shall be paid out of income or that the lease shall remain in effect only so long as the railroad rates and transit and service privileges shall remain unchanged.

■ The doctrine of frustration or impossibility does not apply to a situation so as to excuse performance "where performance is not practically cut off, but only rendered more difficult or costly." Texas Co. v. Hogarth Shipping Co., supra, 256 U.S. 619, at page 630, 41 S.Ct. 612, 615, 65 L.Ed. 1123; Columbus Railway, Power & Light Co. v. Columbus, 249 U.S. 399, 39 S.Ct. 349, 63 L.Ed. 669, 6 A.L.R. 1648; Farmers' Fertilizer Company v. Lillie, 6 Cir., 18 F.2d 197, 52 A.L.R. 552; Restatement Law of Contracts, § 467. In the case of Columbus Railway, Power & Light Co. v. Columbus, supra, a street railway company brought suit to enjoin the city from enforcing the terms of a franchise agreement which required the railway to charge a certain fare. The bill alleged that an order of the National War Labor Board, which could not have been anticipated when the contract was made 17 years previously, had so raised the labor costs of the railway that its business could not be continued at the rate fixed in the contract. Despite this allegation of actual impossibility because of an unanticipated change in conditions without fault of the company, the judgment of the District Court dismissing the bill was affirmed. In the opinion of the Supreme Court (at page 414 of 249 U.S., 39 S.Ct. 349, 354, 63 L.Ed. 669, 6 A.L.R. 1648) it is said: "We are unable to find here the intervention of that superior force which ends the obligation of a valid contract by preventing its performance. It may be, and taking the allegations of the bill to be true, it undoubtedly is, a case of a hard bargain. But equity does not relieve from hard bargains simply because they are such."

In the Farmers' Fertilizer Company Case, supra, the court (at page 199 of 18 F. 2d, 52 A.L.R. 552) said: "An abnormal rise in the price of goods, or in transportation charges, due to the existence of war, or unusual trade conditions, such that defendant could not perform its contract without greater expense than anticipated, is not such an impossibility as will excuse performance."

■ Moreover, even if it be assumed that the facts alleged by the lessee would bring it within the rule of law which it invokes, the defense must still be overruled because the evidence clearly shows that the supervening change of railroad tariffs could not be deemed an event which should have been unanticipated when the lease was renewed in 1933. The Interstate Commerce Commission's order which went into effect July 1, 1935, was promulgated after a lengthy investigation begun pursuant to a Joint Resolution of Congress of January 30, 1925. Hearings were held by the Commission in 1927 and 1928. The revised tariffs went into effect August 1, 1931, but they were canceled February 20, 1932, after a decision of the Supreme Court required the Commission to reopen the hearings so that evidence of the effect of the subsequent economic depression might be heard. Atchison, Topeka & S. F. Ry. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273. The Omaha Grain Exchange, of which the Updike Grain Corporation is a member, was represented at these hearings. The rates which went into effect on July 1, 1935, and which the Updike Corporation alleged were unanticipated, were rates which were temporarily in effect in 1931 and 1932, according to the testimony of appellee's traffic manager. In view of the fact that railroad tariffs are at all times subject to regulation by the Interstate Commerce Commission, and the further fact that both Updike and the North Western Railway officials knew that the Commission was then studying the matter, the testimony of the men who negotiated the lease that they did not anticipate any important change of rates was not substantial and should have been disregarded.

■ The fact that some of the rate increases that went into effect on July 1, 1935, were not required by the order of the Commission is immaterial. The railroad cannot on this account be accused of having violated the lease by making the lessee's obligation more burdensome. These additional charges were a part of a general rate increase announced by all of the carriers in that territory, and applied to all shippers of grain. The North Western Railway, as lessor of the elevator, made no express or implied promise that it would refrain from joining the other railroads in any general policy which might react unfavorably upon its lessee's business.

■ The determining issue in this case is whether the court must read into the lease of this grain elevator an implied provision excusing performance by the lessee because a change in freight rates and transit privileges occurring after the contract was made has rendered its operation unprofitable for the lessee. If a lease may be terminated at the option of one of the parties thereto on such a contingency, we see no reason why

it may not also be terminated upon any other unforeseen contingency which may have the same effect. The movement of grain at such a market as that of Omaha, upon which depends the profit realized by the operation of grain elevators, varies with many factors which are as unpredictable as railroad rates. Weather and crop conditions, government agricultural policy, foreign markets, and general economic conditions are a few of them. Loss of profits due to a sudden change in one of these factors is a risk assumed by the lessee of the elevator and not by the owner, in the absence of an express provision in the lease to the contrary. We know of no reason why loss of profits occasioned by an unfavorable change in freight rates should be treated differently. The record shows that the Omaha Grain Exchange is now attempting to secure from the Interstate Commerce Commission an order revising the tariffs so that the grain elevators at the Omaha market may again be operated at a profit. In case of success the entire gain will inure to the benefit of the appellee. No matter how great the profits may be, the lessor will be bound by its contract and cannot share in the gain. The appellee is equally bound by the contract and, under the circumstances here present, must bear the loss due to unprofitable rates.

Appellant's motion for a directed verdict should have been sustained and that of appellee overruled. For the reason that neither the allegations of the answer nor the facts shown in evidence constitute a defense, the judgment appealed from is reversed and the case remanded, with instructions to the district court to grant a new trial.