SHADBOLT & BOYD IRON COMPANY, Respondent, vs. TOPLIFF, imp., Appellant.

*May 24 — June 21, 1893.*

*Contract for purchase of goods: Assignment to corporation: Consent: Construction: Refusal to perform: Damages.*

| | |
|---|---|
| 85 | 513 |
| 105 | 33 |
| 85 | 513 |
| 107 | 236 |
| 85 | 513 |
| 109 | 578 |
| 85 | 513 |
| 6~ | LRA 232n |
| 85 | 513 |
| 116 | ³555 |

1. Upon the dissolution of a firm and the transfer of its business to a corporation organized by its members, the firm sold to the corporation all its "stock in trade, notes, . . . debts due and to become due, accounts and books of account, . . . and all other choses in action and personal property of every name and nature." An executory contract previously made by the firm for the purchase, from manufacturers, of goods to be retailed in the business of the firm was thereafter taken by the corporation and claimed as its own, without objection from any member of the former firm. In an action by the corporation on such contract, it is *held* that it had been transferred to the corporation.

2. Orders under such contract were sent by the corporation to the manufacturers upon letter heads, etc., showing that the corporation had succeeded to the business, and were filled by the manufacturers. The latter also had actual notice of the change. Afterwards they refused to fill orders upon other grounds, but never objected on the ground that the orders came from the corporation. In an action by the corporation on the contract, it is *held* that the manufacturers had consented to the change and waived their right to object thereto.

3. A written direction by dealers to manufacturers to "enter our order for all steel bow sockets for the year 1888" on certain terms, upon which the manufacturers wrote "Accepted, subject to all unavoid-

able or unforeseen causes," constituted a valid contract for the purchase of all such bow sockets as the dealers might order for the year, upon the terms and subject to the conditions named.

4. The contract was made two months before January 1, 1888. *Held*, that it was for the purchase of bow sockets for the prospective trade of the dealers during 1888, and that they had no right thereunder to order, during 1888, for the trade of 1889.

5. The dealers were doing business in one state and the manufacturers were located in another. The contract was silent as to where the bow sockets were to be shipped to. *Held*, that the question whether the dealers had the right to order them shipped wherever and to whomever they might direct, was a question for a jury, upon legitimate evidence.

6. The manufacturers refused to fill two specific orders from the dealers to ship bow sockets to other parties, and wrote, "We shall ship no more sockets on any of your unfilled orders." It did not appear that prior unfilled orders were not all for shipments to other parties. *Held*, that such refusal might be construed as applicable only to prior unfilled orders, and not a refusal to further perform the contract.

7. In an action against the manufacturers for their refusal to fill orders under the contract, they are liable only for their failure to fill such specific orders as were rightfully made under the contract, or for the loss of profits on sales which the dealers had the opportunity of making and would have made had not the manufacturers in advance refused to fill any more such orders.

APPEAL from the Circuit Court for *Milwaukee* County.

The complaint alleges, in effect, that November 1, 1887, and for a long time prior thereto, and up to January 14, 1888, John Shadbolt, Francis Boyd, and Henry B. Hunter were copartners doing business in the city of Milwaukee under the firm name and style of Shadbolt, Boyd & Co.; that November 1, 1887, the said firm duly entered into a contract with the defendants, under their firm name of the I. N. Topliff Manufacturing Company, by a writing of which the following is a copy, to wit:

"Milwaukee, Nov. 1st, 1887.

" *The I. N. Topliff Mfg. Co., Cleveland, Ohio.*— Gentlemen: Please enter our order for all steel bow sockets for

the year 1888 at 25% net, 90 days, Lea covered bow sockets at 50 and 10% net 90 days, 5% cash 30 days.　Yours, respy.,
" SHADBOLT, BOYD & CO.

"Accepted, subject to all unavoidable or unforeseen causes.　　　　　　I. N. TOPLIFF MFG. CO.　TODD."

The complaint then alleges that January 14, 1888, the firm of Shadbolt, Boyd & Co. dissolved, and its members organized themselves into the plaintiff corporation, and became and are the successors in business of Shadbolt, Boyd & Co.; that at that time the said firm, for value received, duly sold, assigned, transferred, and made over unto the plaintiff all their stock in trade, accounts, outstandings, and all contracts entered into by said Shadbolt, Boyd & Co. for the purchase and delivery of goods, together with the said contract with the defendants and the cause of action arising therefrom; that the plaintiff thereby became, and now is, the lawful owner and holder of said contract, of which the defendants had due notice from the plaintiffs at the time aforesaid; that in pursuance of said contract the said firm, up to January 14, 1888, made various orders for said goods and sockets, which were duly filled by said defendants under said contract; that thereafter the plaintiff, in its corporate name, made various orders for said goods and sockets in accordance with the terms of said contract, which orders were duly acknowledged and filled by the defendants under said contract, until an order of 1,024 sets of steel bow sockets was made on September 18, 1888, by the plaintiff, which order the defendants, without unavoidable or unforeseen cause therefor, refused to fill, and never have filled as required by said contract or otherwise; that afterwards and during September, 1888, the defendants refused to fill three several orders of the plaintiff upon them to send goods directly to three several companies therein mentioned, and which in the aggregate amounted to 1,248 sets of such bow sockets, but which they refused to fill;

that October 2, 1888, the defendants also refused to fill an order of the plaintiff of 100 sets of said bow sockets, without unavoidable or unforeseen cause therefor; that October 1, 1888, the defendants notified the plaintiff by letter that they would ship no more sockets on any of the plaintiff's unfilled orders, without any cause for such refusal or such notice; that at that time the plaintiff was doing a large business in said sockets, and was receiving orders for said sockets in large numbers and amounts, and so continued to receive orders therefor, which it was unable to fill, up to January 1, 1889; that at all the several times mentioned, and at all other times during the year 1888, this plaintiff was ready and willing and offered the defendants to receive and pay for said sockets so ordered pursuant to said agreement, and otherwise has in all respects duly performed all the conditions of said agreement on its part.

The plaintiff claimed $7,136.72 damages for such breach of said contract, over and above all claims and setoffs by the defendant. The complaint also alleged a second cause of action, upon which the plaintiff claimed $1,000 damages.

The defendant demurred to the sufficiency of the complaint, and upon the demurrer being overruled the defendants separately answered, by way of admissions and denials, and alleged that the said Shadbolt, Boyd & Co. were retail dealers in bow sockets, and former customers of the defendant *Topliff*, and had in previous years, under similar orders, made but small orders, and that it was fully understood when the order of November 1, 1887, was given and accepted that the needs and orders of said firm under said order would be for about the same number of bow sockets as had been ordered in previous years, and that both parties so understood said alleged contract; that all orders made by the firm were filled. The answer of said *Topliff* also sets up a counterclaim for goods sold and delivered to

the plaintiff at its request, in the sum of $474.05. The plaintiff, replying to such counterclaim, admitted the facts upon which it was based, but alleged that the counterclaim has been allowed to reduce the plaintiff's claim for damages.

At the close of the trial the jury returned a verdict in the form of answers to two questions submitted to them by the court, as follows: "*First.* Did the defendant know, in fact, at the time he refused to fill further unfilled orders, that the plaintiff was a corporation? *Answer.* Yes. *Second.* Do you find for the plaintiff or the defendant, and in what amount do you assess the damages of the party in whose favor you find? *A.* For the plaintiff, in the sum of $2,959.55." From the judgment entered upon said verdict, March 24, 1892, for the amount of damages so found and costs, the defendant *Topliff* appeals.

*Charles E. Monroe*, attorney, and *W. W. Boynton*, of counsel, for the appellant.

For the respondent there was a brief by *Turner & Timlin*, of counsel, and *Rogers & Mann*, attorneys, and oral argument by *W. J. Turner*.

CASSODAY, J. This case is peculiar, in some of its features.

1. The firm of Shadbolt, Boyd & Co., of Milwaukee, wrote the defendants, of Cleveland, November 1, 1887, to the effect: "*Please enter our order for all steel bow sockets for the year 1888*" at the terms therein named. The defendants wrote at the bottom of such order the words, "Accepted, subject to all unavoidable or unforeseen causes," and signed the same. Here was a general order which implied a promise to receive and pay for all such bow sockets as the firm might order for the year and upon the terms therein named, and a general acceptance which implied a promise to fill all such orders as should be made, subject

Shadbolt & Boyd Iron Co. vs. Topliff.

to the conditions therein named. In other words, the writing embodied the mutual promises of the one party to the other, and hence was based upon a good and valuable consideration, and hence was binding upon the respective parties.

2. It is contended that neither the complaint nor the evidence shows that the plaintiff corporation was or is a party to such written contract. The dissolution of the firm, the incorporation of the plaintiff, and the transfer of all the assets and property of the firm to the plaintiff by the firm, January 14, 1888, appear to be sufficiently alleged and proved. Upon this point the court charged the jury: " The point is made that this bill of sale did not, in terms, assign this contract. It may be true that there is not a word in the bill of sale which accurately and legally describes this executory contract; but it is so obvious, upon the face of the paper, that there was a manifest intent to sell the whole business, as well as the whole property of the concern, that I shall hold as a matter of law, and so instruct you, that this bill of sale was intended to and did in fact transfer this contract in question from the former firm to the newly-formed corporation. And, if it were not so, still it is true the new corporation took the contract and claimed it from that time forward as its own, without objection from the former firm. It must have been without objection on their part, because every member of the former firm was a member of the new corporation. And I therefore charge you, as a matter of law, and dispose of this question once for all, that this contract was, so far as it was competent for the parties to do so, assigned by the firm who made it to the corporation who succeeded that firm." [1] This part of the charge appears to be fully

[1] The bill of sale referred to in the charge, from Shadbolt, Boyd & Co. to the *Shadbolt & Boyd Iron Co.*, purported to sell and convey " the following described personal property, situate and being in the city and county

justified by the pleadings and the evidence, and hence the exceptions to particular portions of it are overruled.

3. It is contended that the defendants never consented to such substitution of the plaintiff company in place of the old firm, and hence were not bound to fill any such orders made by the plaintiff. The court stated to the jury, in effect, that the defendants "might have declined to deal with this new corporation upon the contracts made with the old firm," had they seen fit to do so, but that they had not. It appears that upon the organization of the plaintiff company, and for about two months thereafter, it used the old billheads or letter heads of the firm, and stamped thereon the words, " *Shadbolt & Boyd Iron Co., successors to*," so that the whole billhead read, " *Shadbolt & Boyd Iron Co., successors to* Shadbolt, Boyd & Co.;" that at the expiration of such period the plaintiff got up new billheads or letter heads, with the name of the corporation and the names of its officers thereon, including its president, vice-president, secretary, and treasurer, and that the defendants thereupon, and long before they refused to fill any of such orders, received numerous copies of such new billheads or letter heads, as well as such old billheads so stamped, and filled the plaintiff's orders for such bow sockets written thereon. Upon this point the court charged the jury as follows: " All the evidence is to the effect that after the change of the plaintiffs from a copartnership into a corporation they always signed their communications, ' *Shadbolt & Boyd Iron Co.;*' that their billheads also indicated that a change had been made; and that after the first two or three months their

of Milwaukee and state of Wisconsin, to wit: All the stock in trade, notes, bonds, stocks, mortgages, debts due and to become due, accounts and books of account, leasehold interests, and all other choses in action and personal property of every name and nature, wheresoever and whatsoever the same may be, owned or held by said Shadbolt, Boyd & Co. in said county or elsewhere." — REP.

billheads indicated that they had been formed into a cor-
poration, because they gave, not merely their corporate
name, but the names of their officers as well, and stated
facts upon every billhead and letter head entirely at variance
with the idea of the continuance of the old firm as a mer-
cantile firm.  Whatever objections they made from the be-
ginning to the end of the business, they never did object
that the plaintiff was a corporation.  They always made
their objections upon some other ground.  So that I charge
you, as a matter of law, that they did consent to this
change, and did waive their right to object by reason of
this change, and that they are as liable to the *Shadbolt &
Boyd Iron Company*, upon the facts of this case, as they
would have been if the firm had remained Shadbolt, Boyd
& Co.  I take the responsibility of making this decision
and relieving you from any responsibility upon it, because
to me the evidence is too clear for dispute, and because the
evidence upon which I base this opinion is all of it written
evidence,— unmistakable, unambiguous, written evidence,—
which it is the duty of the court to construe, and not to
send to the jury."

These statements are fully justified by the undisputed
evidence.  It is admitted that September 8, 1888, the
plaintiff ordered the defendants to send to one of its cus-
tomers in Ohio a certain number of such bow sockets; that
September 17, 1888, the defendants answered the letter
covering such order, and therein objected to filling such
order on the ground that it did not come within the terms
of the contract as understood by the parties, but nowhere
objected on the ground that such order was made by the
plaintiff company instead of the old firm; and among other
things the defendants therein stated: " You also *told the
writer, when he called upon you* later on, after contract had
been made, *that we could count on* S. B. *Iron Co.* for as
many as they had taken during 1887 from Topliff & Ely."

It is conceded that the call which the writer of that letter so made upon the plaintiff was in March, 1888, or in June, 1888. Thus it appears that the defendants were expressly "told" as early as June, 1888, that they had been doing business with the "S. B. *Iron Co.*" instead of the old firm, so that the defendants not only had the constructive notice by way of the billheads and letter heads mentioned, but also actual notice, as early as June, 1888. Besides, the jury expressly found that the defendant knew, in fact, at the time he refused to fill further unfilled orders, that the plaintiff was a corporation.

4. It appears that the defendants and the Topliff & Ely Company, a corporation of Elyria, Ohio, the only manufacturers of such patented bow sockets, entered into an agreement April 2, 1888, whereby it was agreed, in effect, that such bow sockets should thereafter be sold by them, respectively, at prices to be fixed by a committee therein agreed upon, *and for no less;* provided, however, that such agreement should not include or prohibit either party from filling or complying with any former contract; that in pursuance of such agreement the manufacturer's price of such bow sockets was increased in July, 1888, ten cents on each set, and September 2, 1888, another increase was made, of ten cents on each set, making a total increase of twenty cents on each set over and above the price named in the contract upon which this action is based. The result was that the plaintiff was thereby enabled to sell such bow sockets so ordered from the defendants at a lower price than the price so fixed by such committee; and so it happened, in September, 1888, that dealers in Ohio, who had previously purchased of such manufacturers, ordered of the plaintiff a large number of such bow sockets, and thereupon the plaintiff ordered the defendants to ship, in the aggregate, 1,248 sets of such bow sockets directly to such Ohio dealers, which the defendants refused to do, on the ground

Shadbolt & Boyd Iron Co. vs. Topliff.

that such orders were not within the scope of the contract, and not within the contemplation of the parties thereto at the time of making the contract. Upon this point the court charged the jury that "there has been some discus-sion as to whether or not the defendants were required to fill some of the orders that were sent to them. There was a concern called the Hamilton Buggy Company, that made an order which they refused to fill,— I do not know upon what ground except that it was too large an order. There was another man, by the name of Cooper, for whose benefit the plaintiff made an order, and directed the goods to be delivered to him. The plaintiff had a perfect right, in the ordinary course of business, to order goods delivered direct to customers. It was not necessary that all goods should be sent to Milwaukee and then sent off again. It is the ordinary course of business, as doubtless some of you understand, for wholesalers or jobbers, when they are order-ing goods from a factory, to order them to be shipped direct to their customers, and there is ordinarily no objection to that."

We are constrained to hold that it was error for the court to thus charge the jury, as a matter of law, that the defendants were bound, under the contract, to fill such or-ders. In an action for the breach of an executory contract for the sale and delivery of personal property, the damages should be limited to such as may naturally or, according to the usual course of things, fairly and reasonably arise from such breach of the contract itself, or from such breach com-mitted under circumstances in the contemplation of both parties at the time of making the contract. Certainly, such may be fairly regarded as the result of the English cases. *Hadley v. Baxendale*, 9 Exch. 341; *Horne v. Midland R. Co.* L. R. 7 C. P. 583, L. R. 8 C. P. 131; *Elbinger v. Arm-strong*, L. R. 9 Q. B. 473; *Hobbs v. L. & S. W. R. Co.* L. R. 10 Q. B. 111; *McMahon v. Field*, 7 Q. B. Div. 594; *Hamil-*

*ton v. Magill*, L. R. 12 Ir. 202; *Borgnis v. Nugent*, 15 Q.
B. Div. 85. These adjudications differ somewhat in the
language employed, but it is believed that they are all to
substantially the same import. This court has repeatedly
sanctioned such proposition. *Candee v. W. U. Tel. Co.* 34
Wis. 471; *Walsh v. C., M. & St. P. R. Co.* 42 Wis. 23;
*McNamara v. Clintonville*, 62 Wis. 211; *Thomas, B. &
W. Mfg. Co. v. W., St. L. & P. R. Co.* 62 Wis. 649.

The contract in the case at bar is silent as to where the
defendants were to ship the bow sockets. Shadbolt, Boyd
& Co., at the time of making the contract, were doing
business in Milwaukee. They simply directed the de-
fendants to enter their order. The question is whether, in
making the contract, the parties contemplated that such
shipments should be made by the defendants to whereso-
ever and to whomsoever the plaintiff might direct. The
contract in this regard is uncertain and ambiguous. Thus,
Brett, L. J., in one of the cases cited, speaking of the
three phases of the rule of damages as laid down in the
leading case, said in effect that whether the damage claimed
was the probable consequence of the breach, or " whether
it was in the contemplation of the parties when the con-
tract was made," were rather questions of fact for a jury,
than of law for the court, to determine. 7 Q. B. Div. 595.
Other cases cited are of a similar import. Whenever, as
here, the contract is silent or ambiguous, it must neces-
sarily be a question for the jury, upon legitimate evidence.
*Nilson v. Morse*, 52 Wis. 240; *Swanke v. McCarty*, 81 Wis.
112; *Dana v. Fiedler*, 12 N. Y. 40, 62 Am. Dec. 130. We
must hold that the giving the portion of the charge last
quoted was error.

5. As indicated, the contract was " for all steel bow sock-
ets for the year 1888." Upon that point the court, among
other things, charged the jury "that the words 'all steel
bow sockets' mean 'all that we shall require or buy or use

for the year 1888.' And the words '1888' mean from the first day of January, 1888, to the last day of December of that year. It does not include part of 1887, and does not terminate until the end of 1888. . . . The plaintiff brought this suit on the 12th day of February succeeding the year 1888, and his damages are limited to the loss of business and profits down to that time, and may not be extended beyond it. If he anticipated further damage or loss, he had his option to wait and bring his suit later, so as to include such anticipated damages or losses. . . . It was his right, upon the narrowest construction of his contract, to be supplied at the end of the year with the amount of stock which he usually carried on hand. And upon my construction of the contract it was his right to have on hand at the end of the year as large a lot of bow sockets as he had a reasonable expectation of being able to sell at a profit." As indicated, the contract was made two months before January 1, 1888. As we construe it, Shadbolt, Boyd & Co. were at liberty during those two months to commence ordering such bow sockets as might be necessary for their prospective trade to commence January 1, 1888, and to end December 31, 1888; but neither they nor the plaintiff, as their successor, had any right under the contract to order such goods during the year 1888 for the trade of 1889. It is true, as indicated in another portion of the charge, that "the year 1888" are words of limitation so far as the plaintiff is concerned; but such limitation was confined to the period in which sales of the goods so ordered were to be made by Shadbolt, Boyd & Co. and the plaintiff as their successor, but not as the period in which their *orders* for such goods were to be made. For these reasons we think the particular portions of the charge last quoted were erroneous in allowing damages for losses in the plaintiff's trade between December 31, 1888, and February 12, 1889, on the theory that the plaintiff, under

Shadbolt & Boyd Iron Co. vs. Topliff.

the contract, had the "right to have on hand at the end of the year as large a lot of bow sockets as he had a reasonable expectation of being able to sell at a profit."

6. If the defendants failed to fill orders for such bow sockets, properly made by the plaintiff under the contract, then the plaintiff is entitled to all legitimate damages resulting from such breach. It is conceded that the verdict includes some damages for such bow sockets never ordered by the plaintiff. The theory upon which such damages are claimed is that the defendants, by letter dated October 1, 1888, declined to fill two specific orders from the plaintiff to ship directly to certain Ohio dealers, and also wrote to the plaintiff, "We shall ship no more sockets on *any* of your unfilled orders." It is contended that this was an express refusal by the defendants to further perform their contract. The expression used may, however, be fairly construed as applicable only to prior outstanding and "*unfilled*" orders; and for aught that appears they may all have been orders to ship directly to outside dealers, and not to the plaintiff itself, and which, as indicated, the defendants claim did not come within the scope of the contract. The difficulty with such contention is the uncertainty as to loss of profits on bow sockets never ordered by the plaintiff, and which the evidence fails to show that the plaintiff had an opportunity of selling. Remote, contingent, uncertain, and speculative damages are excluded by all well-considered adjudications. *Bradley v. Denton,* 3 Wis. 557; *Brayton v. Chase,* 3 Wis. 456; *Shepard v. Milwaukee G. L. Co.* 15 Wis. 318, 82 Am. Dec. 679; *Thomas, B. & W. Mfg. Co. v. W., St. L. & P. R. Co.* 62 Wis. 642; *Poposkey v. Munkwitz,* 68 Wis. 322; *Griffin v. Colver,* 16 N. Y. 489, 69 Am. Dec. 718; *McKinnon v. McEwan,* 48 Mich. 106, 42 Am. Rep. 458. Upon reviewing the authorities upon this subject the late Mr. Justice LAMAR, speaking for the whole court, in *Howard v. S. & B. Mfg. Co.* 139 U. S. 206, well said: "The grounds

Shadbolt & Boyd Iron Co. vs. Topliff.

upon which the general rule of excluding profits in estimating damages rests, are: (1) That in the greater number of cases such expected profits are too dependent upon numerous uncertain and changing contingencies to constitute a definite and trustworthy measure of actual damages; (2) because such loss of profits is ordinarily remote, and not, as a matter of course, the direct and immediate result of the nonfulfilment of the contract; (3) and because, most frequently, the engagement to pay such loss of profits in case of default in the performance is not a part of the contract itself, nor can it be implied from its nature and terms. . . . But it is equally well settled that the profits which would have been realized had the contract been performed, and which have been prevented by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, or where, from the express or implied terms of the contract itself or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into."

By the contract the plaintiff's assignors entered their general order for bow sockets, as indicated, to be followed by specific orders from time to time. The defendants can only be held liable, upon the principles mentioned, for their failure to fill such specific orders as were rightfully made under the contract, or for the loss of profits on sales which the plaintiff had the opportunity of making and would have made had not the defendants in advance refused to fill any more such orders.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.