MARRINAN MEDICAL SUPPLY, Inc., v. FT. DODGE SERUM CO.

No. 8926.

Circuit Court of Appeals, Eighth Circuit.

Feb. 20, 1931.

M. J. Doherty, of St. Paul, Minn. (Doherty, Rumble, Bunn & Butler, of St. Paul, Minn., on the brief), for appellant.

Claude Krause, of Minneapolis, Minn. (Cobb, Hoke, Benson, Krause & Faegre, of Minneapolis, Minn., and Price & Burnquist, of Ft. Dodge, Iowa, on the brief), for appellee.

Before STONE and BOOTH, Circuit Judges, and DEWEY, District Judge.

BOOTH, Circuit Judge.

This is an appeal from a judgment entered on the pleadings after a demurrer had been sustained to a counterclaim interposed in the answer of appellant, defendant below. Plaintiff, Ft. Dodge Serum Company, sued defendant on two causes of action. The first contained two counts: One for goods sold and delivered, covering certain serums; the other on an account stated. The second cause of action contained two counts: One for the agreed price of certain goods shipped to defendant on consignment under an agreement that, for all such goods kept by defendant, defendant would pay the prices agreed upon. The count alleged that defendant did keep certain of the goods shipped, and further alleged that demand was made by plaintiff for return of the goods; but defendant refused to return them and refused to pay for them. The other count was on an account stated.

Defendant, in its answer, set up a written contract between the parties, dated September 10, 1925, and admitted receiving shipments thereunder from plaintiff; and admitted that there was due plaintiff from defendant $7,880.84 for anti-hog cholera serum, and virus; and for other products $2,802.07, making a total of $10,682.91.

As a counterclaim, defendant set up the making of the contract of September 10, 1925; the making of similar prior contracts by the parties since February, 1923; that defendant had built up and enjoyed a large and lucrative trade and business in the prod-

ucts covered by said contract in the territory covered thereby; that it was known and contemplated by the parties that the contract was entered into with the expectation that defendant would make a profit therefrom; that it was known and contemplated that there was not and would not be on the market an available supply of such products sufficient to meet the demands of defendant's trade in the territory covered by the contract if plaintiff should fail or refuse to carry out the contract, and that such failure of plaintiff would result in loss of profit by defendant; that defendant fully performed all the terms and conditions of the contract; that on or about August 22, 1926, plaintiff violated the contract and refused to further ship to defendant anti-hog cholera serum or to fill defendant's orders therefor, although defendant sent such orders at various times, and that finally plaintiff notified defendant that it would not ship to defendant any anti-hog cholera serum for an indefinite time; and that plaintiff thereafter repudiated said contract and declared the same invalid; that by reason of such breach of said contract, defendant was damaged generally in the sum of $25,000 and specially as alleged, in the additional sum of $55,579.45.

Since the contract ran for three years, and the counterclaim alleged a refusal by plaintiff to perform further after August, 1926, without fault on the part of defendant, there would seem to be on the face of the pleading a breach of the contract.

But the contract itself is made part of defendant's answer and counterclaim, and it is contended by plaintiff that, in so far as the contract was executory, it was invalid on its face for lack of consideration, mutuality, and certainty; and further that, even if the contract were valid, there was no obligation on the part of plaintiff to ship goods until the orders were approved.

The written contract between the parties, so far as here material, is set out in the margin.[1]

---

[1] "This Duplicate Agreement, made and entered into this tenth day of September, 1925, by and between Fort Dodge Serum Company of Fort Dodge, Iowa, party of the first part, and the Marrinan Medical Supply, Inc., of St. Paul, Minnesota, as party of the second part, Witnesseth:

"That the party of the first part hereby agree to sell on consignment to the party of the second part, the products of said first party hereinafter specified and at the prices hereinafter designated upon the terms and conditions herein contained for the period of three years from and after the first day of September, 1925, subject however, to the conditions of this contract.

"It is expressly understood and agreed that the party of the first part in matters in connection with this contract is engaged only in interstate business.

On this appeal, counsel have deemed it material, as having a bearing on the question of validity, to determine whether the contract is one of factorage or of sale. We, therefore, consider that question first.

It is apparent from an inspection of the contract that it does not readily fall into either of the classes, factorage or sale, classically considered. But in recent times, the real or supposed needs and exigencies of business and the ingenuity of business men and of their lawyers have evolved a class of contracts which have the earmarks of both sale contracts and factorage contracts. It is not always easy to determine into which class a particular contract falls. If it becomes necessary to decide the question, all the court can do is to consider the various earmarks as disclosed by the contract, and the surrounding facts and circumstances, and determine, as best it can, into which class the contract should be placed.

In the case at bar, the contract is of the anomalous character mentioned.

As indicating that the contract was one of sale, it is contended by plaintiff: (A) (1) That the contract contains such expressions as "to sell on consignment * * * at the prices hereinafter designated"; (2) that there is an agreement by defendant to report "the amount of the products *sold to it by the first party still on hand*"; (3) that there is the provision for credit to appellant on certain products not to exceed "ten percent *of its total purchase*"; (4) that there is the agreement by appellant to sell the products "*so purchased by it*" only to veterinarians; (B) that the contract contains an obligation to pay for the goods in the provision, "second party agrees to remit to the first party on or before the 10th day of the month a sum covering the sales of the preceding calendar month"; (C) that the contract gives to the consignor no right to demand a return of the goods, and to the consignee no right to return the goods; (D) that the contract contains the statement that the consignor should not be considered as doing an intrastate business in Minnesota; and it is contended, therefore, that the title passed to the consignee; (E) that there are in the contract

---

and is not in any wise engaged in the business of selling or distributing its products in intrastate business within the State of Minnesota. The orders for material placed by the second party must be approved by the first party at its office in Fort Dodge and remittances must be made to the first party at its office in Fort Dodge and the fact that the prices are based on a declared sum, f. o. b., St. Paul, Sioux Falls, or at any other point now or hereafter agreed upon between the parties shall not be, and cannot be construed as involving the first party in intrastate business within the States so named. The first party shall upon written order of the second party ship the merchandise so ordered to the second party on consignment to the point requested by the said second party and shall allow the said second party, discounts and terms as follows: * * *

"All the above prices are f. o. b., St. Paul, Minnesota, or Sioux Falls, South Dakota.

"It is further mutually agreed by and between the parties hereto that should the established retail price of the first party on serum and virus, or either of them, either increase or decline during the life of this contract, the discount above mentioned shall apply on the then net retail prices of the said first party.

"The first party agrees to furnish to the second party a reasonable supply of printed matter for advertising purposes without charge.

"It is specifically understood and agreed that the first party grants to the second party the sole right to sell its products in the State of Minnesota and North Dakota on the express condition that the second party shall actively and energetically promote the sale of the products of the said first party within said States using for said purpose all of the means ordinarily used in successful merchandising, including travelling salesmen, advertising, and circularizing possible customers for said products, and that part of the consideration for the first party not engaging in intrastate business in the States of Minnesota and North Dakota shall be such active energetic salesmanship on the part of the second party.

"In addition to the States of Minnesota and North Dakota, the said second party is given the privilege of selling the products of the first party in the State of South Dakota, but such privilege in the State of South Dakota shall not be regarded as an exclusive privilege. If the second party shall undertake the sale of the products of the first party in the State of South Dakota it shall exercise its business and most energetic endeavor to promote the sale of the products of the first party in said States or in any portion of said State which it attempts to cover.

"The first party has certain customers in the State of South Dakota which are engaged in the sale of its products. The first party will not secure new customers in the State of South Dakota or attempt to increase its interstate business in said state so long as the second party shall actively promote the sale of the first party's products in that state.

"The second party agrees to properly care for the products consigned to it by the said first party and to keep an accurate record of the same and to furnish such records from time to time as may be requested by the first party; said records to show sales made from time to time and the amount of the products sold to it by the first party still on hand and the said second party agrees to remit to the first party on or before the 10th day of the month a sum covering the sales of the preceding calendar month. Biologic and pharmaceutic invoices when paid by the 10th inst. shall be subject to a cash discount of 5%.

"The second party shall not return in any fiscal year, outdated biologics for credit or exchange to an amount in excess of ten per cent. of its total purchase of their biologics during said fiscal year.

"It is further understood and agreed that in case of fire, strikes, shortage of material, act of God, public enemy, or any other matter over which the first party has no control and which shall make it impossible for the first party to fill the orders of said second party as placed, then and in that event, the first party shall not be liable in damage to the said second party for any injury sustained by reason of such causes.

"It is further agreed by and between the parties hereto that the second party shall sell the products so purchased by it from the first party only to veterinarians or upon prescriptions of veterinarians. It shall not sell hog colera virus or anti-hog cholera serum for less than the established retail prices of the said first party."

no words expressly establishing an agency; (F) that there was no provision in the contract for segregation of funds of the consignor from those of the consignee; (G) that, with two exceptions, the consignor retained no control over the sales price of the consignee.

On the other hand, as indicating that the contract was not one of sale, it is contended by defendant: (A) That the expression in the contract "sell on *consignment*" and "ship * * * on *consignment*" are indicative of a factorage contract rather than of an out and out sale; (B) that there is a granting of territory to the consignee in which to make sales; (C) that the contract provides that the consignee shall "properly care for the products consigned to it," "keep an accurate record of the same," and "furnish such records" to the consignor, the records to show "sales made from time to time," and the "amount of the products sold to it by the first party still on hand"; (D) that there is no absolute provision for payment by the consignee, but only a provision that consignee shall remit by the tenth of each month "a sum covering the sales of the preceding calendar month"; (E) that the limitation in the contract on the return of outdated biologics presupposes a right of return as to other goods; (F) that the contract contains a provision restricting the consignee in making sales, to two classes—veterinarians, and those having prescriptions from them; (G) that, as to major products shipped, the consignee in selling is restricted by a minimum price; (H) to the foregoing may be added that there is a fixed and definite period of time for the continuance of the contract; (I) that, by the second cause of action set up in plaintiff's complaint, it appears to be admitted that plaintiff did ship certain of its products to defendant on *consignment* with the right on the part of the consignee either to keep the goods and pay for them, or to return them; and with the right on the part of the consignor to demand return of such goods.

These various tests as to the character of the contract have all of them been recognized in the adjudicated cases, the weight given to each differing according to the facts and circumstances of each case. Standard Co. v. Magrane-Houston Co., 258 U. S. 346, 42 S. Ct. 360, 66 L. Ed. 653; Met. Nat'l Bank v. Benedict Co., 74 F. 182 (C. C. A. 8); In re Wells (D. C.) 140 F. 752; In re Columbus Buggy Co., 143 F. 859 (C. C. A. 8); In re Smith & Nixon Piano Co., 149 F. 111 (C. C.

A. 8); Butler Bros. Shoe Co. v. U. S. Rubber Co., 156 F. 1 (C. C. A. 8); In re Caldwell Mach. Co. (D. C.) 215 F. 428; In re Thomas (D. C.) 231 F. 513; Mitchell Wagon Co. v. Poole (C. C. A.) 235 F. 817; B. S. Pearsall Butter Co. v. Federal Trade Com'n (C. C. A.) 292 F. 720; In re U. S. Elec. Sup. Co. (D. C.) 2 F.(2d) 378; In re Eichengreen (D. C.) 18 F.(2d) 101; Federal Rubber Co. v. King, 12 Ga. App. 261, 76 S. E. 1083; Kingman Plow Co. v. Joyce, 194 Mo. App. 367, 184 S. W. 490; Arbuckle Bros. v. Kirkpatrick & Co., 98 Tenn. 221, 39 S. W. 3, 36 L. R. A. 285, 60 Am. St. Rep. 854; Baskerville v. Bates, 123 Minn. 339, 143 N. W. 909; Norris v. Boston Music Co., 1917B, 615; notes, L. R. A. 1916F, 336, et 129 Minn. 198, 151 N. W. 971, L. R. A. seq.; L. R. A. 1917B, 626.

We shall not discuss these various tests in detail. We have considered them all, and have reached the negative conclusion that the contract in the case at bar should not be classified as a sales contract, pure and simple. In reaching this conclusion, we have attached special importance to the provision in the contract as to payments, which we construe as meaning that the consignee shall pay by the tenth of each month for the goods sold *by it to its customers* during the preceding calendar month. This is the construction which the parties themselves placed upon the provision as shown by the allegation in the counterclaim which stands admitted.

We have also attached importance to the provisions of the contract requiring the consignee to care for the goods and keep records of sales for the benefit of the consignor; to the provisions restricting the consignee in its prices to customers and its choice of customers; and to the provision fixing a definite term for the contract to run.

We have also attached importance to the admissions in the complaint (second cause of action) relative to the character of the transactions covering certain of the goods shipped.

■ We turn to the question of validity. The contract involved is a bilateral one, and it is, therefore, necessary that it should have mutuality of consideration. Examination of the contract discloses that plaintiff agrees: (a) To ship its products on orders of defendant; (b) to furnish to defendant certain advertising matter; (c) that defendant is to have the exclusive right to sell in Minnesota and North Dakota; (d) that defendant is to have the nonexclusive right to sell in South Dakota if it undertakes to sell there;

(e) that plaintiff will not try to increase its interstate business in South Dakota, if defendant undertakes to sell there; (f) that plaintiff will allow to defendant certain discounts and terms of payment.

On the other hand, defendant agrees: (a) to advertise plaintiff's products in the territory by means ordinarily used, such as traveling salesmen, circularizing possible customers, etc; (b) to care for the products shipped by plaintiff; (c) to keep and furnish to plaintiff records of the products sold and products on hand; (d) to remit payment on the tenth of each month for goods sold during the preceding calendar month; (e) to sell only to veterinarians or persons having prescriptions from them; (f) to sell at prices not below a fixed minimum; (g) if defendant shall undertake to sell in South Dakota, that "it shall exercise its business and most energetic endeavor to promote the sale of the products" in that state. Inasmuch as the counterclaim shows that defendant did undertake to sell in South Dakota, this promise lost its contingent character and became absolute; (h) to actively and energetically promote the sale of the products of plaintiff in Minnesota and North Dakota.

The last item is the center of attack. It is contended by plaintiff that this item was a condition and not a promise; that it is not permissible to take language which is merely a condition attached to a grant of territory and make that language answer as a reciprocal promise to the promise of plaintiff to ship goods. It is true that, in one place in the contract, this undertaking was put in the form of a condition; but we think there was an implied obligation to promote sales in Minnesota and North Dakota, although clothed at one place in the contract in conditional form. Our reasons for this conclusion, briefly stated, are as follows:

(1) We have already seen that there was an express obligation to promote sales in South Dakota, and there appears no valid reason why there should be a difference of obligation in respect to Minnesota and North Dakota. The language of the contract negatives any such distinction. It reads: "Part of the consideration for the first party not engaging in intrastate business in the states of Minnesota and North Dakota shall be such active energetic salesmanship on the part of the second party."

(2) The contract, when viewed as a whole, leads to the same conclusion. Contracts are usually entered into by business men with the purpose that they shall be performed, and there is an implied agreement that each party shall exercise good faith in trying to carry them out. Courts will take these elements into consideration in construing a contract.

(3) The sole main purpose of the contract in the present case was to bring about sales of plaintiff's products in Minnesota, North Dakota, and South Dakota. If the defendant had refrained from honest efforts to promote sales in Minnesota and North Dakota, it would have been evidence of bad faith on its part.

(4) The parties themselves have construed the contract as calling for promotion of sales in Minnesota and North Dakota by defendant. The counterclaim shows this construction by the parties, and that a large established business was built up by defendant in those two states.

It is contended further by plaintiff that, even if there were mutuality of consideration, yet that the contract was void for uncertainty; that the contract neither fixes any definite or ascertainable amount to be shipped, nor is it measurable by the requirements of appellant's business.

If the contract here in question were a pure contract of sale, the criticism of uncertainty would be formidable. But we have held that the contract is not purely one of sale. It partakes of the character not only of a sales contract, but also of a factorage contract, and perhaps also of a sales agency contract. In the two latter classes of contracts, uncertainty as to amount is inherent in their very nature. Where territory is to be exploited and orders to be solicited by salesmen, the number and amount of such orders cannot, of course, be foretold. They can be determined only by the potential demand of the territory and the diligence of the salesmen. Contracts of factorage or sales agency are not invalid for such uncertainty, and we hold that the present contract is not on that account invalid.

Finally it is urged that, inasmuch as the contract contained an express reservation of right of approval by plaintiff, this of itself characterizes the contract as having no binding effect.

We cannot agree with this contention. A reading of the contract leads to the conclusion that probably the approval clause was inserted solely for the purpose of stamping the transactions as interstate instead of intrastate. But however that may be, the clause in question did not give plaintiff the right to reject orders arbitrarily. This is

shown conclusively by the provision that the plaintiff should not be liable for failure to fill orders when such failure arose from act of God, fire, strikes, shortage of material, or any other matter over which plaintiff had no control. Such a provision would have been unnecessary if plaintiff possessed an arbitrary right of refusal to approve orders. Farmers' Fertilizer Co. v. Lillie (C. C. A.) 18 F.(2d) 197, and see note, 52 A. L. R. 557.

As supporting the views we have expressed that the contract was valid and enforceable, many cases may be cited. We call attention to a few:

In Wood v. Duff-Gordon, 222 N. Y. 88, 118 N. E. 214, the facts are thus stated in the syllabus: "Defendant is a 'creator of fashions' whose favor helps a sale, and manufacturers of feminine apparel are willing to pay for a certificate of her approval. She entered into an agreement with plaintiff employing him to turn this vogue into money. He was to have, for the term of one year, and thereafter unless terminated by a written notice, the exclusive right, subject to her approval, to place her indorsements on the designs of others and in return she was to have one-half of all profits and revenues derived from any contract he might make. Plaintiff claims that he kept the contract and that the defendant broke it, by placing her indorsement on articles without his knowledge and withholding the profits, and sues her for the damages. Defendant demurs to the complaint on the ground that the agreement lacks the elements of a contract in that plaintiff does not bind himself to anything."

The court in its opinion said at page 90 of 222 N. Y., 118 N. E. 214: "The agreement of employment is signed by both parties. It has a wealth of recitals. The defendant insists, however, that it lacks the elements of a contract. She says that the plaintiff does not bind himself to anything. It is true that he does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs. We think, however, that such a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view to-day. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed (Scott, J., in McCall Co. v. Wright, 133 App. Div. 62, 117 N. Y. S. 775; Moran v. Standard Oil Co., 211 N. Y. 187,

198, 105 N. E. 217). If that is so, there is a contract."

In Ehrenworth v. Stuhmer & Co., 229 N. Y. 210, page 218, 128 N. E. 108, 110, the contract, as stated by the court, was as follows: "* * * The defendant's predecessor and the defendant were desirous of obtaining a market for the particular kind of bread known as 'pumpernickel,' or black bread, which they manufactured, and considered that plaintiff would be able to create and maintain such a market for it and build up their trade in this particular black bread. In order to accomplish this, it was agreed that the plaintiff should purchase and the defendant should sell all the black bread which the plaintiff required upon his route in East New York and Brownsville, and should pay therefor a price one cent less than the wholesale price and two cents less than the retail price. The contract was to last as long as both parties were in business and was assumed by the corporation when it was organized to carry on the copartnership business under corporate form."

The court in its opinion said at page 219 of 229 N. Y., 128 N. E. 108, 110: "It is contended that there was no express promise to purchase any particular amount of the black bread, but this promise, even if it be not expressed, is implied. The plaintiff impliedly, if not expressly, agrees to buy all the black bread which he can use on his route, and to purchase it from no other. The latter is clearly expressed. Every detail of a contract need not be specifically expressed. The law takes a broader view of what must be contained in a contract. All the circumstances which go to make up this contract are instinct with an obligation to purchase, even though it may be imperfectly expressed."

Hayes v. Clark, 95 Conn. 510, 111 A. 781, involved a written contract between the owner of real estate and a real estate broker. By the terms of the contract, the broker was made the owner's sole agent, for a stated period, at a stated commission, to sell the property. The owner agreed to report to the broker all offers made by the owner. The contract contained no promises on the part of the broker. The owner sold the property without notice to the broker. In a suit by the broker, it was contended that there was no mutuality in the contract, and that it lacked consideration. The court said at page 515 of 95 Conn., 111 A. 781, 783: "The defendant fails to appreciate that, under certain circumstances, written contracts bearing the signatures of both parties, which on their

face and by their express terms appear to be obligatory on one party only, create a corresponding and correlative obligation on the other party by implication. This principle of law is stated as follows in Ruling Case Law, vol. 6, p. 688, § 95: 'Frequently it happens that contracts on their face and by their express terms appear to be obligatory on one party only; but in such cases, if it is manifest that it was the intention of the parties and the consideration upon which one party assumed an express obligation that there should be a corresponding and correlative obligation on the other party, such corresponding and correlative obligation will be implied.' Minneapolis Mill Co. v. Goodnow, 40 Minn. 497, 42 N. W. 356, 4 L. R. A. 203, and note; Williston on Contracts, vol. 1, § 90; Page on Contracts (2d Ed.) vol. 1, § 187." And further at page 517 of 95 Conn., 111 A. 781, 784: "When the owner and broker signed the agreement, Exhibit A, an executory contract was made. The promises of the owner were expressed in the agreement. The promises of the broker were implied from the terms of the agreement and the situation of the parties created by it. The implied promise of the broker was that he would become the owner's broker with exclusive right to sell the property for one year, and perform the duties resulting from such an agency. These implied duties were that he would in good faith use reasonable efforts to procure a purchaser of the property. Reasonable efforts mean such efforts as are reasonable under the circumstances. Among the circumstances to be considered are the facts that the owner is to employ no other broker and is to pay the broker employed a commission of 2 per cent. if the owner accepts a purchaser from any source."

In American Distributing Co. v. Hayes Wheel Co. (D. C.) 250 F. 109 (reversed on another point [C. C. A.] 257 F. 881), the American Distributing Company undertook to make sales of wheels manufactured by the Hayes Wheel Company. The latter company breached the contract, and the American Distributing Company sued. The court in its opinion said at pages 114, 115 of 250 F.:

"It is urged that the contract does not expressly impose any obligation upon the plaintiff, but only upon the defendant, and that therefore it is void for lack of mutuality. I have carefully considered this contention, but am unable to agree with it. It will be noted that the contract took the form of a letter from the plaintiff to the defendant, in which the former made a 'proposal for

conducting the sale of' defendant's wheels. The plaintiff begins by declaring:

" 'We will undertake the sale of your wheels * * * for the entire United States upon the following terms and conditions.'

"The letter then provides for the payment of the commission mentioned 'on all orders received, accepted, and shipped by' defendant. This clearly contemplated that plaintiff would at least 'undertake' to secure and submit to defendant certain orders. Plaintiff also says:

" 'It being understood that all orders taken by us shall be submitted for your acceptance.'

"This certainly implies an undertaking by plaintiff to take orders and submit them to defendant. * * *

"The object of this contract was undoubtedly the establishment of business relations between the plaintiff and defendant, under which the former would in good faith endeavor to secure all of the orders reasonably possible for the wheels manufactured by the defendant and submit such orders to the latter for acceptance, for which services the defendant would pay the plaintiff the commission agreed upon, and this arrangement was to continue for the period mentioned.

"I am of the opinion that by the terms of this contract the parties must be held to have agreed impliedly, if not expressly, that plaintiff would exercise good faith and reasonable diligence in obtaining orders for submission to and acceptance by defendant during the term of the contract, and the contract, therefore, is not open to the objection that it lacks mutuality."

In Emerson v. Pacific Coast, etc., Co., 96 Minn. 1, 104 N. W. 573, 1 L. R. A. (N. S.) 445, 113 Am. St. Rep. 603, 6 Ann. Cas. 973, a written contract signed by both parties was entered into. Defendant Packing Company agreed to pay to the plaintiffs a commission on sales, and agreed that plaintiffs might sell 85 per cent. of defendant's pack of fish. Plaintiffs accepted the contract and obligated themselves during a period named to use their best endeavors to sell defendant's goods, and actually performed services and incurred expenses. Defendant breached the contract, and suit was brought. It was held that the contract was not void for lack of mutuality.

In W. G. Taylor Co. v. Bannerman, 120 Wis. 189, 97 N. W. 918, 919, " * * * a written contract was made on February 1,

1899, in the following words: 'We hereby appoint the W. G. Taylor Co., of Milwaukee, our agents for Wisconsin and Illinois, and agree to sell them the following described stone, f. o. b. cars Berlin, Wis., as follows: [List of kinds and prices.] It is further agreed that the W. G. Taylor Co. are our exclusive agents for Wisconsin and Illinois, and we will quote no prices to others without their consent. This agreement is understood to be in force for the full term of one year from February 1st, 1899.' Signed by both parties."

The court in its opinion said: "Appellants' first position is that the entire contract of February 1, 1899, was void for want of mutuality, for that the plaintiff did not thereby bind itself to purchase any stone or do any other thing. This position we deem untenable. The signature of plaintiff's name to that paper was obviously for the purpose of acceptance. The presumption is that such signing was done for some purpose, and no other is apparent. If an acceptance, it bound the plaintiff to perform any acts on its part necessarily implied either from those things which defendants were bound to do or from the situation created by the contract. Shadbolt, etc., Co. v. Topliff, 85 Wis. 513, 55 N. W. 854; McCall v. Icks, 107 Wis. 233; 83 N. W. 300; Excelsior Wr. Co. v. Messinger, 116 Wis. 549, 555, 93 N. W. 459. Plaintiff therefore bound itself to be defendants' exclusive agent within the territory named, which, by the way, included the entire territory in which defendants' product could be advantageously sold, and to perform the duties resulting from such agency. Exactly what those duties were we need not attempt to catalogue. They at least included good faith and due diligence in bringing defendants' stones to the notice of possible consumers for purpose of sale to them."

In Mueller v. Bethesda Mineral Spring Co., 88 Mich. 390, 50 N. W. 319, 320, "plaintiff agreed to act as sole agent and sell all of defendant's mineral water that he could in a certain territory, and defendant agreed to furnish the water and pay a certain part of plaintiff's advertising bill if the sales reached a certain amount in a given time." The court, in answer to the contention that the contract lacked mutuality, said: "Mueller had been handling these goods, and the appointment was made in response to a proposition on Mueller's part, referred to in defendant's letter of October 3, 1887, to act as agent of the company. He agreed to act as sole agent of the company for the sale of these goods at Detroit. By the acceptance of that agency he agreed to do all that its acceptance implied, viz., to hold out the goods to the public, and to further the interests of his principal. One who receives goods on commission does not usually expressly agree to do anything, but there is in this class of cases an implied agreement, sufficient to support the promise and contract." See, also, Ellis v. Dodge Bros. (C. C. A.) 246 F. 764; Robertson v. Garvan (D. C.) 270 F. 643; Memphis Furniture Mfg. Co. v. Wemyss Furniture Co. (C. C. A.) 2 F.(2d) 428; Farmers' Fertilizer Co. v. Lillie, supra; Abrams v. Geo. E. Keith Co. (C. C. A.) 30 F.(2d) 90; Kaufman v. Farley Mfg. Co., 78 Iowa, 679, 43 N. W. 612, 16 Am. St. Rep. 462; Hirschhorn v. Bradley, 117 Iowa, 130, 90 N. W. 592; Scott v. T. W. Stevenson Co., 130 Minn. 151, 153 N. W. 316; Fred Allen, etc., Co. v. Johns-Manville Co., 211 Ill. App. 217; Leisy Brewing Co. v. Schafer, 91 Okl. 105, 216 P. 109.

The cases cited and relied upon by plaintiff are largely cases involving sale contracts. In those cases it was rightly held that a promise to sell must be accompanied by a promise to buy, and that certainty as to the amount, etc., must also be found in the contract in order that it may be held valid.

Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co., 114 F. 77, 57 L. R. A. 696 (C. C. A. 8) was a case which involved an alleged sales contract pure and simple. No question of factorage or sales agency was involved. The court in its opinion said at page 79 of 114 F.: "This supposed contract consisted of a written offer to deliver manufactured articles in unnamed quantities at certain specific prices at any time between October 27, 1898, and June 1, 1899, and the acceptance of that offer, without more. The answer contains no averment that either the plaintiff or the defendant paid any consideration or performed any act to induce the contract, except the remitting of the offer by the plaintiff, and the sending of its acceptance by the defendant. * * * The plaintiff does not agree to deliver, nor does the defendant contract to receive or pay for, any quantity or amount whatever of the articles named in the writings."

The court held that the contract, so far as it was executory, was void for want of consideration and mutuality. As we have attempted to show, the rule of requiring strictly reciprocal promises, and the rule of requiring certainty of amounts, etc., commonly applicable to sale contracts pure and simple, are not applicable in strictness to contracts

which partake of the character of factorage and sales agency.

A. Santaella & Co. v. Otto F. Lange Co., 155 F. 719 (C. C. A. 8), involved an oral contract, the terms of which were to be found only by an analysis of a mass of testimony. In the pleadings, on the trial, and on the appeal, the contract was treated as a sales contract pure and simple. It covered the sale of cigars by a manufacturer to a wholesale dealer having customers in a large territory. Suit had been brought by the manufacturer against the dealer on a promissory note and for balance on account of goods sold and delivered. The defendant dealer admitted the indebtedness, but interposed a counterclaim for damages on account of alleged breach by the manufacturer of the contract of sale. On the trial the dealer recovered. On appeal, the judgment was reversed on the ground that the contract, in its executory features, was void for lack of mutuality of consideration, the dealer not being under obligation to buy any cigars. On the petition for rehearing, the dealer contended that the appellate court had decided the case on a question not raised on the record, and contended further that the evidence showed that the contract did obligate the dealer to develop the territory and to buy all cigars used by the trade in the territory of the manufacturer. In denying the petition for rehearing, the court said that the question of validity of the contract was presented by the record on the appeal, whether assigned or not. The court pointed out that, notwithstanding the evidence, which it was claimed showed an obligation on the part of the dealer to purchase, yet the evidence showed without contradiction that the contract obligation to buy, conceding its existence, could be ended at any time at the whim of the dealer, and, further, that such had been the construction placed upon the contract by the parties.

It is plain, upon analysis, that the Santaella Case does not control the case at bar. One vital point of difference is that, in the present case, the contract had a fixed period of duration, so that the obligation of defendant medical company to develop trade and to transmit orders was not terminable at the whim of that company.

Huffman v. Paige-Detroit Motor Car Co., 262 F. 116 (C. C. A. 8), was a case involving a contract by which the defendant motor car company granted to plaintiff Huffman the exclusive right to sell Paige automobiles in certain territory. The contract, by its terms, had a specified date of expiration. Plaintiff sued for damages for wrongful cancellation prior to the specified date. Demurrer was sustained to the complaint in the lower court. Appeal from the judgment was sustained. The court in its opinion said at page 118: "But aside from the provisions above noted, indicating a lack of mutuality of obligation, the contract expressly reserved to defendant the right of cancellation when in its opinion the plaintiff was not working the territory to the best advantage. By another clause it was provided that, if the defendant 'believes that the dealer (the plaintiff) is not properly and diligently pushing the sale of its cars, it hereby reserves the right at its election, and without making itself liable in any manner for any claim or action for damages, * * * to cancel and terminate this agreement. * * *' It is quite manifest that the contract merely furnished a basis for future dealings to be observed no longer than was mutually satisfactory. There was no hard and fast commitment of either party, if he chose to break away."

Obviously the Huffman Case differs widely from the case at bar.

In view of the circumstances surrounding the parties at the time of entering into the contract; in view of the undertakings by each, as expressed in the contract; and in view of the purpose of the contract viewed as a whole, we have no hesitation in holding that the contract is "instinct with an obligation" on the part of defendant medical company to promote sales of plaintiff's products in Minnesota and Dakota; that the contract was not void for uncertainty; and that the clause providing that the orders should be approved by plaintiff did not prevent the contract from having a binding effect.

We think the counterclaim of defendant was not demurrable as setting up an invalid contract.

The judgment is reversed, with instructions for further proceedings not inconsistent with the views herein expressed.